RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JANE DOE and JOHN DOE, Individually and as the natural parents and next of kin of Minor Doe,

>*Plaintiffs-Appellants*,

*v.*

No. 19-3019

JACKSON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, TAMARA NEFF, MICHELLE KRIEG, JIMMIE SINGLETON, SUSANNE WALTMAN, and HARLEY NEFTZER,

>*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:17-cv-01931—Sara E. Lioi, District Judge.

Argued: October 23, 2019

Decided and Filed: April 1, 2020

Before: GUY, BUSH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Laura L. Mills, MILLS, MILLS, FIELY & LUCAS, LLC, Canton, Ohio, for Appellants. Sherrie C. Massey, PETERS KALAIL & MARKAKIS CO., LPA, Cleveland, Ohio, for Appellees. **ON BRIEF:** Laura L. Mills, MILLS, MILLS, FIELY & LUCAS, LLC, Canton, Ohio, for Appellants. Sherrie C. Massey, David S. Hirt, PETERS KALAIL & MARKAKIS CO., LPA, Cleveland, Ohio, for Appellees.

---

**OPINION**

---

MURPHY, Circuit Judge.  Like other cases involving the "state-created-danger" theory of substantive due process, this case comes to us with tragic facts: a fifth grader sexually assaulted a kindergartener.  *Cf. McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 462 (6th Cir. 2006); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 725 (6th Cir. 2005).  The fifth-grade student, C.T., lit a match during the bus ride home from an Ohio elementary school.  In response, school administrators moved him to the front of the bus.  While seated in the front, he sexually assaulted the kindergarten student, Minor Doe, as they rode home from school over several weeks.  C.T. was expelled and is not a defendant.  Instead, Minor Doe's parents brought a state-created-danger claim against the Jackson Local School District Board of Education and five school employees.  The district court granted summary judgment to these defendants, holding that no reasonable jury could find that they knowingly exposed Minor Doe to the risk of sexual assault.  We must agree, and respectfully reaffirm that the Constitution does not empower federal judges to remedy every situation we find "heart-wrenching."  *Schroder*, 412 F.3d at 731.

I

In the fall of 2015, Jimmie Singleton began driving the bus that C.T. and Minor Doe rode to and from their elementary school.  The bus driver that Singleton replaced had handled this route for years, but retired at the end of the prior school year.  Soon after this transition, school administrators fielded some parent complaints about Singleton's ability to prevent student misconduct compared to the previous bus driver.  Harley Neftzer, the school's director of transportation, spoke with Singleton about the complaints and did not hear further concerns from parents for the rest of the school year.

At the start of the 2016–2017 school year, Singleton created a seating chart for the students on his bus.  The school district encouraged drivers to assign younger students to the front of the bus and older students to the back.  Minor Doe was entering kindergarten and C.T. was entering the fifth grade.  So Singleton assigned C.T. to a seat in the back with the older

children, while Minor Doe sat in the front row directly behind the driver's seat.   Another kindergartener sat next to Minor Doe in the mornings on the way to school.  But Minor Doe sat alone in the afternoons because her seatmate did not ride the bus home.

On September 15, 2016, a student told his teacher that C.T. had lit a match on the bus the day before.  The teacher relayed this concern to the dean of students, Michelle Krieg.  Krieg and a guidance counselor, Tamara Neff, investigated the allegation.  Students told them that C.T. had lit matches during the afternoon bus ride and had lit matches and burned cardboard while waiting at the bus stop the prior morning.  A camera on the bus recorded C.T. lighting a match and throwing it out the window over another student's head.  A search of the school grounds turned up matches in a bathroom trashcan.  Making matters worse, C.T. had tried to prevent fellow students from telling school administrators about his conduct.  One student had immediately attempted to report C.T. to Singleton, but C.T. had blocked her path to the bus driver.  And C.T. had promised not to bother another student for the rest of the year if the student did not tell anyone about the matches.

Krieg and Neff summarized the findings of their investigation for the school's principal, Susanne Waltman.  Waltman interviewed C.T.  He was initially dishonest about what he had done.  When Waltman confronted him with the bus video, C.T. confessed.

Waltman disciplined C.T.  She found that he had violated several codes of conduct.  His violations included: "failing to tell the truth"; engaging in "[b]ehavior which causes or reasonably could cause physical harm to students or adults"; and "[p]ossession of or igniting of" a device "which produces an explosion, smoke, fire, gas, or odor."   She placed C.T. in "alternative day assignment" for a day and a half.  She suspended him from riding the bus for a week or so.  And she required him to sit in the front row of the bus across from the driver for the rest of the school year.  Waltman wanted C.T. in that seat because it would be "easier [for the bus driver] to see" him, and "if he lit a match, the driver could smell it."

Waltman also crafted a "Safety Plan" for C.T.   For the indefinite future, a school employee would meet C.T. at the bus each morning and escort him to the school office, where school officials would check his backpack.  Someone would then escort C.T. to class.  C.T. could

not go into the hallway or restrooms unless escorted by an adult. He could only play on the playground blacktop near the adult monitors. And he would have assigned seats in gym class, in music class, in the library, and in the cafeteria. Waltman explained that she wanted C.T. "to be close to an adult at all times" because C.T. had been "dishonest" when asked about the matches.

Before this incident, school administrators had been involved with C.T. one prior time. Teachers had developed a "Success Plan" for C.T. soon after he enrolled in the middle of his third-grade year. According to Neff, the guidance counselor, C.T. had struggled with "being truthful, being respectful of other people's property, and following directions the first time they were given." He, for example, "would take someone's glue sticks" and deny doing so. As part of the plan Neff checked in with C.T. about ten times in all. By the end of C.T.'s third-grade year, she recalled that the Success Plan "kind of dwindled off." By C.T.'s fifth-grade year, his teacher described him as "a little bit chatty, talkative, but really kind of typical of a fifth grade boy."

Singleton, the bus driver, learned that C.T.'s new seat assignment would be in the bus's front-right seat. Waltman claims that she explained to Singleton that C.T. "had lit matches on the bus and he was coming to the front because he was not truthful." Singleton, however, recalls hearing about the matches and seat restriction from Neftzer, the director of transportation. No one told Singleton about C.T.'s building restrictions.

C.T. shared his new front-row seat with a kindergarten boy. C.T.'s parents say they asked that he sit alone, but Singleton was not advised of such a request. When making this assignment, Waltman did not consider which students were assigned to the front of the bus. C.T.'s new seat was across the aisle from Minor Doe's. Her seat, directly behind Singleton, was "the worst seat on the bus" in terms of his visibility.

At some point after C.T. returned to the bus, he moved out of his assigned seat and into Minor Doe's seat. Singleton denied knowing that C.T. had moved across the aisle because, he said, he keeps his "focus on driving the bus." Singleton also denied telling C.T. that he could sit with Minor Doe, but video footage shows at least one instance where Singleton appears to have

motioned C.T. to sit next to Minor Doe. Principal Waltman did not follow up with Singleton to ensure that he was enforcing C.T.'s new seat assignment.

At dinner on the night of Friday, November 11, Minor Doe told her parents that C.T. had done "something really gross" on the bus ride home. She then described how C.T. had forced her to engage in sexual acts several times. Minor Doe's parents immediately notified the police and emailed Principal Waltman. Waltman informed her superiors and arranged to meet with Minor Doe's parents Monday morning. Before the meeting, Waltman and Neftzer reviewed the bus's video footage and confirmed that C.T. had sexually assaulted Minor Doe. During the ensuing investigation, they learned that C.T. had taken steps to hide the assaults. C.T. told the kindergarten boy who shared his assigned seat to look out the window while the assaults occurred. And he positioned his backpack so that Singleton, the bus driver, could not see the assaults.

On Monday morning, Waltman suspended C.T. before he came to school. C.T. never returned to the school, was eventually expelled, and later pleaded guilty to gross sexual imposition. The school cooperated with the police, who concluded that Singleton had not known of the assaults.

Minor Doe and her parents sued the School Board and five school employees: Singleton (the bus driver), Waltman (the principal), Neff (the guidance counselor), Neftzer (the director of transportation), and Krieg (the dean of students). The Does alleged, among other claims, that the employees violated the Due Process Clause's implied "substantive" component by failing to prevent C.T.'s sexual assault of Minor Doe. *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 2018 WL 6590615, at *7 (N.D. Ohio Dec. 14, 2018). The district court granted summary judgment to the defendants, concluding that this claim failed because the Does could not show that the defendants had "acted with the 'requisite culpability to establish a substantive due process violation[.]'" *Id.* at *9 (citation omitted).

Even assuming a constitutional violation, the court alternatively concluded, the Does still could not recover damages from the School Board or the school employees. It held that the Does could not obtain damages from the Board because they did not show that C.T.'s assault arose

from a Board policy or custom, as required for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Doe*, 2018 WL 6590615, at *11. And it held that the Does could not seek damages from the employees because they would be entitled to qualified immunity even if they had violated due process. The Does identified no "clearly established" caselaw that would have constitutionally compelled the employees to do more under the circumstances. *Id.* at *17.

II

The Does challenge only the district court's holding that the school employees did not act with deliberate indifference; they nowhere challenge (or even acknowledge) the district court's alternative holdings that *Monell* and qualified immunity would bar relief against the Board and the school employees even if they had violated due process. Yet "[a] ruling by us that the [Does] have shown a constitutional violation, unaccompanied by a ruling with respect to any municipal policy [or qualified immunity], would not suffice to alter the judgment." *Hardrick v. City of Detroit*, 876 F.3d 238, 244 (6th Cir. 2017). That fact might suggest we could affirm on these unchallenged grounds alone. *See id.* at 243–44; *White Oak Prop. Dev., LLC v. Washington Township*, 606 F.3d 842, 854 (6th Cir. 2010). Oddly, however, the school defendants also did not raise these *Monell* and qualified-immunity bases for affirmance. Given the parties' briefing decisions, we exercise our discretion not to "address the municipal-policy and qualified-immunity issues . . . because both theories share an initial premise—the violation of a federally protected right—that has not been satisfied." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005); *see Hardrick*, 876 F.3d at 244.

A

State actors who commit sexual assaults "deprive" their victims of their "liberty" interest in bodily integrity within the meaning of the Due Process Clause. *See Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996). Here, however, a private student (not a state actor) deprived Minor Doe of this liberty interest. The Does' allegations against the state actors thus stem from their failure to protect Minor Doe from C.T.'s abuse. Yet this "failure-to-protect" claim faces immediate textual and precedential problems. The clause's text provides: "[N]or shall any State

deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This plain language, which restricts deprivations *by the state*, imposes "a limitation on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

*DeShaney* adopted this plain-text reading. It held that social workers did not violate due process when they negligently failed to prevent a father from abusing his son, Joshua DeShaney. *Id.* at 203. According to the Court, the Due Process Clause's text and history showed that the clause did not compel states to protect their residents from a private party's violence. *Id.* at 195–96. The clause instead allowed the states to decide democratically whether to hold public actors accountable for failing to protect residents. *Id.* at 196, 202–03. To reach this result, the Court distinguished Joshua DeShaney from individuals (such as prisoners) who are in state custody and whom a state has a constitutional duty to protect. *See id.* at 198–200. Yet the abuse that Joshua suffered occurred when he was in the custody of his father, not the government. *Id.* at 201.

Both text and precedent thus could be read to foreclose the Does' claim that school officials violated due process by failing to prevent C.T.'s abuse. After all, we have repeatedly held that students in schools are not in state "custody" within the meaning of *DeShaney*. *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 854 (6th Cir. 2016). We have, however, carved out an exception to *DeShaney*'s rule that a state has no constitutional duty to protect individuals who are not in its custody. When rejecting the due-process claim, *DeShaney* described the case's facts as follows: "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201. We have used this sentence to adopt a "state-created-danger theory" of substantive due process, and have gradually molded that theory into a three-part test. *See Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491–92 (6th Cir. 2019). An official must initially take an "affirmative act . . . that either create[s] or increase[s] the risk that the plaintiff [will] be exposed to private acts of violence." *Schroder*, 412 F.3d at 728. Next, this risk of private harm must rise to the level of a "special danger" to a specific victim that exceeds the general risk of harm the public faces from the private actor. *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). Last, when exacerbating this risk of harm, the

official must act with a sufficiently culpable mental state. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006).

We can resolve this case on the third "culpability" element alone. Our decisions have described this element in different ways. Sometimes we have said that a public official either "must have known or clearly should have known that [the official's] actions specifically endangered an individual." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017). Other times we have said that a public official must have "acted with the requisite culpability to establish a substantive due process violation[.]" *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002).

Which test applies? The latter one more accurately articulates current law. A should-have-known framework comes close to "suggest[ing] a classic negligence formulation." *Estate of Romain*, 935 F.3d at 493–95 (Murphy, J., concurring). But a public official's negligence cannot prove a substantive-due-process violation even where the official directly inflicts the injury. *See County of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998); *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986). And our recent decisions using the should-have-known test have their roots in *Kallstrom*, a case predating the Supreme Court's *Lewis* decision. *E.g.*, *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Since *Lewis*, we have recognized that the culpability standard that applies to state actors who indirectly allow a private party to inflict harm should not be lower than the culpability standard that applies to state actors who directly inflict that harm themselves. *See Ewolski*, 287 F.3d at 510.

This answer leads to another question: What is "the requisite culpability to establish a substantive due process violation"? *Id.* The Supreme Court has told us that the Constitution sets a high bar for this sort of constitutional tort. That is so because this claim relies on due process's implied substantive component and so requires courts to make subjective judgments with little grounding in constitutional text or history. Here, as elsewhere, the Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The Court has added a federalism concern to this subjectivity concern. It has long resisted turning due process into a "font of tort law." *Paul v.*

*Davis*, 424 U.S. 693, 701 (1976).  Nowhere does the Constitution "purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."  *Daniels*, 474 U.S. at 332.  The Constitution instead leaves those rules of the behavioral road for the states themselves to regulate.  *Id.*

For these reasons, the Supreme Court has held that an executive actor's conduct violates the Due Process Clause only if it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Lewis*, 523 U.S. at 847 n.8.  These colorful descriptors may be "more than a little 'open-ended.'"  *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015) (Gorsuch, J.) (citation omitted).  But they at least, "as Judge Friendly put it, 'poin[t] the way'": only extreme misconduct will violate the clause.  *Lewis*, 523 U.S. at 847 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  To offer clearer guidance, the Court has placed this shocks-the-conscience test within tort law's traditional "spectrum of culpability."  *Id.* at 848.  On one end, negligent conduct will never shock society's conscience.  *Daniels*, 474 U.S. at 328.  On the other, conduct unjustifiably "intended to injure" is the "most likely to rise to the conscience-shocking level."  *Lewis*, 523 U.S. at 849.  The Court has reserved a case-by-case approach for public actors who cause harm with a state of mind falling in between these extremes—such as actors who are deliberately indifferent to the risk of a private party's harm.  *Id.*  It has said that deliberate indifference can at times support liability if a public official injures (or fails to protect) someone that the government has taken into custody.  *See Farmer v. Brennan*, 511 U.S. 825, 835–38 (1994).  But it has added that an actual intent to injure is required when public actors must make hasty decisions, such as during a high-speed chase or a prison riot.  *Lewis*, 523 U.S. at 852–53.

Our court has imported this deliberate-indifference standard into the state-created-danger context, at least when officials have "the opportunity for reflection and unhurried judgments.'"  *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) (quoting *Ewolski*, 287 F.3d at 511 n.5); *cf. Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 539–40 (6th Cir. 2008).  The standard has two parts.  An official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Ewolski*, 287 F.3d at 513 (quoting *Farmer*, 511 U.S. at 837).  "Having drawn the inference," the

official next must "act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights." *Id.* (citation omitted). Given the call for caution in this area, *Collins*, 503 U.S. at 125, our cases set demanding rules for both parts of this standard.

Start with the first part: To "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *Ewolski*, 287 F.3d at 513 (citation omitted), a public official must know of more than a *general* risk of harm. The official must know of the *specific* risk that later develops. In *McQueen*, for example, a first-grade student ("John Smith") fatally shot another student ("Jane Doe") when the children's teacher, Alicia Judd, left them unsupervised. 433 F.3d at 463. Before this shooting, Smith had been "involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil." *Id.* at 462. Doe's mother sued Judd and alleged that she "knew that Smith might violently assault another student" and ignored that risk by leaving him unsupervised. *Id.* at 469. But Judd's knowledge of Smith's "sometimes violent behavior" was not enough to prove that she knew that Smith posed a risk of gun violence. *Id.* (citation omitted). Judd had no notice that Smith "would escalate from hitting with fists, feet, and pencils" to shooting with guns. *Id.* at 470; *see also Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014).

Turn to the second part: To act with "reckless or callous indifference," *Ewolski*, 287 F.3d at 513 (citation omitted), a public official must do more than be aware of "a substantial risk of serious harm," *Hunt*, 542 F.3d at 543. The official's response to that harm must also be "conscience shocking." *Schroder*, 412 F.3d at 731. And if the official chooses a response motivated by a "legitimate governmental purpose," this element will generally be absent. *Hunt*, 542 F.3d at 542. *Schroder* best proves that point. In that case, city officials knew that a street's speed limit risked deadly accidents because residents repeatedly warned them of that risk and asked for a lower speed limit. 412 F.3d at 726. After a speeding car tragically killed a 10-year-old boy, his parents sued those officials under the state-created-danger theory. *Id.* We rejected their claim. While the officials may have "exhibited deliberate indifference to the[] warnings," that indifference alone did not suffice. *Id.* at 729. "It is in the very nature of deliberative bodies to choose between and among competing policy options," we said, and "a substantive due process violation does not arise whenever the government's choice prompts a known risk to

come to pass." *Id.* The official's choice of a speed limit simply did not establish the required "'callous disregard' or 'conscience shocking' element." *Id.* at 731.

B

Measured against these standards, the Does have not created a genuine dispute of material fact over the culpability element of our state-created-danger test. *See McQueen*, 433 F.3d at 463. Before explaining why, we must begin with a high-level point about the cause of action in 42 U.S.C. § 1983. The Does barely distinguish among the Board and the five school employees, making broad-bush statements against "Defendants-Appellees" collectively. That will not do. "[V]icarious liability is inapplicable to . . . § 1983 suits," so a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *McQueen*, 433 F.3d at 470. The Does thus must show that each employee knew of a risk that C.T. would sexually assault Minor Doe and responded to that risk in a way that society would find "conscience shocking." But they have little to say about the knowledge or conduct of several defendants. Take Michelle Krieg, the dean of students. She gathered the facts as part of the school's match-lighting investigation. But she "was not involved in . . . the development of" the Safety Plan or "the decision to assign [C.T.] to sit in the front of the bus." How could Krieg face liability given her tangential connection to the harm? The Does do not say. They instead focus on the actions of Susanne Waltman (the principal) and Jimmie Singleton (the bus driver). Yet the Does fail to establish either part of our deliberate-indifference standard for any school employee.

1. *Knowledge of the Risk.* We agree with the district court that "nothing about C.T.'s school record . . . could have put the [school employees] on notice that [C.T.] posed a risk of sexually assaulting" Minor Doe. *Doe*, 2018 WL 6590615, at \*10. Consider the facts they knew: C.T. had lit a match on the bus and threw it out the window, and had lit matches and burned cardboard at the bus stop. These actions showed that, when left unsupervised, C.T. might engage in risky behavior that could put fellow students in harm's way. School employees also knew that C.T. had prevented students from reporting his conduct, and had been dishonest when confronted by school officials. All told, then, they knew that C.T.'s poor judgment, bullying tendencies, and

dishonesty had the potential to endanger students.  Yet nothing about the "kind and degree of risk" from this reckless match-lighting incident suggested that C.T. also posed a risk of intentional sexual assault.  *Range*, 763 F.3d at 591.

In that respect, this case is easier than *McQueen*.  There, the school official actually knew of the shooter's history of intentional violence against other students.  As noted, "in the months leading up to the shooting, [he had been] involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil."  433 F.3d at 462.  Yet these prior assaults did not put his teacher on notice that he would resort to gun violence.  *Id.* at 469–70.  Here, the school officials had no knowledge of C.T. ever attacking students.  If a history of physical violence cannot establish subjective awareness of a risk of gun violence, it follows that C.T.'s lighting of a match—better categorized as reckless—cannot establish subjective awareness of a risk of sexual violence.

Nor would any other conduct have given the school employees the required notice.  C.T.'s third-grade "Success Plan," for example, had nothing to do with school violence, let alone sexual assault.  Simply put, C.T.'s theft of glue sticks would not warn the employees that C.T. might sexually assault students.  It is likewise insufficient that the Does' expert witness opined that sexually abusive youth also frequently have behavioral problems.

2. *Response to the Risk*.  The school employees' responses to the risk also do not show the "callous disregard" or "conscience shocking" behavior that our state-created-danger cases require.  *See Schroder*, 412 F.3d at 731.  They did not ignore a risk that C.T. would harm his fellow students.  Far from it.  Soon after the dean of students got word of the match-lighting claims, the school employees quickly investigated the incident.  And Principal Waltman designed a Safety Plan tailored to C.T.'s misconduct.  That plan would, for the most part, put C.T. "close to an adult at all times," which would reduce the opportunities for the type of reckless behavior that C.T. had undertaken on the bus and at the bus stop.

To be sure, Waltman's choice to move C.T. to the front of the bus put him closer to Minor Doe.  But Waltman did not make this seating change for some "arbitrary" reason designed to increase the risks of harm to Minor Doe.  *Hunt*, 542 F.3d at 543.  Waltman was instead

"motivated by a countervailing, legitimate governmental purpose." *Id.* at 542. She moved C.T. to his front-row seat across from Minor Doe because it would be "easier [for the bus driver] to see" him, and because "if he lit a match, the bus driver could smell it." As she put it: "You can't smell a match when you're in the front and the children are in the back." She chose a course of action based on the known risk before her (match lighting), not based on an unknown risk that had yet to come to pass (sexual assault).

When choosing C.T.'s discipline, Principal Waltman also faced the "tradeoffs" we have said generally do not establish conscience-shocking behavior. *Id.* Waltman chose a discipline that, it's safe to say, regularly occurs in schools across this country: If a child misbehaves on a bus, the child gets moved to the front of the bus. *Cf. Moore v. Chilton Cty. Bd. of Educ.*, 1 F. Supp. 3d 1281, 1290 n.4 (M.D. Ala. 2014). On the other hand, tougher sanctions faced countervailing concerns. Sure, Waltman could have sought to expel C.T. or barred him from the bus. But these harsher sanctions likely would have risked an administrative or judicial retort that the punishment did not fit the crime. *Cf. Cisek v. Nordonia Hills Bd. of Educ.*, 2011 WL 806518, at *4 (Ohio Ct. App. Mar. 9, 2011); *see Goss v. Lopez*, 419 U.S. 565, 573–75 (1975). Our state-created-danger cases have sought to avoid this type of "Catch 22." *Hunt*, 542 F.3d at 542.

As will often be the case in retrospect, Waltman and Singleton also could have done more when implementing this discipline. Singleton could have ensured that C.T. stayed in his assigned seat. And Waltman could have followed up with Singleton about the discipline. At most, however, the failure to take these additional precautions suggests negligence, which falls well short of establishing the required "callous disregard for the safety" of Minor Doe. *Ewolski*, 287 F.3d at 514. And even these specific choices came with tradeoffs of their own. The more time Singleton spent monitoring for student misconduct, the less time he spent watching the road. It is not callously indifferent to prioritize his "focus on driving the bus" for the safety of all. And, as Waltman explained, "there are so many moving parts in a school building during a day" that "following up with every single on-the-spot decision is not even humanly possible." In short, "the practicalities of day-to-day governance require officials to make difficult allocation choices and tradeoffs," and "it is generally not for the courts to compel affirmative steps in one area at the expense of another in weighing competing policy options."

*Schroder*, 412 F.3d at 730. No school employees in this case acted in a way that could be characterized as "conscience shocking." *Id.* at 731.

C

The Does make a factual point and a legal point in response. Factually, they identify the "extensive" Safety Plan as smoking-gun evidence that the school employees knew that C.T. posed a serious risk of harm. Yet nothing in the Safety Plan suggests, as our cases require, that the employees perceived the *specific* risk that materialized—the risk that C.T. would sexually assault another student. *McQueen*, 433 F.3d at 469–70. To the contrary, Waltman was preoccupied with C.T.'s specific infraction—lighting matches and lying about it—when designing the Safety Plan. C.T. was not moved to the front of the bus for fear he might violently attack older students in the back. He was moved to the front because he might light a match. Up front (unlike in the back), the driver would be better able to smell any flame and take the proper recourse.

Regardless, the Does' use of this Safety Plan to impose liability on the school employees flips the deliberate-indifference standard on its head. That approach would impose liability on officials who vigorously respond to risks of harm (because this response evinces their knowledge), while giving a free pass to officials who do nothing in response (because this omission evinces their lack of knowledge). So "imposing liability . . . for acting in this manner would dissuade [school employees] from responding expeditiously" to future risks. *Tanner v. County of Lenawee*, 452 F.3d 472, 479 (6th Cir. 2006). That is why, in addition to a known risk of harm, our deliberate-indifference standard has a second part—a requirement that the response to the harm be "conscience shocking." *Schroder*, 412 F.3d at 731. The extensive nature of the Safety Plan all but confirms that the defendants' response in this case was anything but.

Legally, the Does challenge the district court's conclusion that the school employees could be liable only if they knew of the risk of the specific type of harm—here, sexual assault. It is a strange rule, they say, that would absolve the school employees of liability for C.T.'s sexual assault of Minor Doe, but subject them to liability if C.T. had burned her instead. They argue it should be enough that the employees knew of a general risk of harm from C.T. Both precedent

and logic rebut this claim. As a matter of precedent, our cases foreclose the general-risk-of-harm standard that the Does request. *See McQueen*, 433 F.3d at 469–70. Under their rule, *McQueen* would have been wrongly decided. The teacher in that case undoubtedly knew that the student posed a general risk of harm from his prior history of beating up children and stabbing them with pencils. *Id.* at 462. But we rejected liability for his later gun violence nonetheless. *Id.*

As a matter of logic, our cases focus on the kind of *risk* known to the state actors because that will inform the kind of *response* the Constitution requires. Here, for example, because C.T. imposed a risk of lighting matches, the school employees developed a plan that would discourage him from bringing matches on the bus. Their measures included not just moving him to the front of the bus, but also letting him know that they would be checking his backpack every morning for contraband. It is not at all clear that these preventive measures would have subjected the school employees to constitutional liability even if C.T. had burned Minor Doe. And no matter the result on those hypothetical facts, the Constitution simply does not require a school to treat an 11-year-old as a violent sexual predator based on a history of lying, bullying, or playing with matches. This is not a negligence claim, but one sounding in a rare species of one of the narrowest doctrines of constitutional law. *See Estate of Romain*, 935 F.3d at 492. While C.T.'s sexual assault of Minor Doe undoubtedly shocks the conscience, the school employees' responses to C.T.'s earlier actions do not. And it is their conduct that is at issue here.

\* \* \*

One final point bears repeating. Nothing in the federal Constitution prevents the states, through their democratically elected representatives, from enacting laws that require school officials to meet heightened standards of care in protecting their students. *Cf. Jones*, 438 F.3d at 699. Ohio, for example, does not extend tort immunity to municipal officials who act in a "reckless manner[.]" *Doe*, 2018 WL 6590615, at *17 (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). Although the Does brought state tort claims in the district court, *id.* at *17–18, they abandoned those claims in favor of a constitutional claim on appeal. Yet the federal Constitution supplements traditional state tort liabilities only in rare circumstances involving what the Supreme Court has described as truly "egregious" and "outrageous" conduct. *Lewis*,

523 U.S. at 847 n.8.  Because the conduct of the school employees in this case does not meet that high bar, we must affirm.