NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0338n.06

No. 21-2732

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 18, 2022
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| ANDRE REYNOLDS, as the Personal Representative of the Estate of Deborah Reynolds, Deceased; ESTATE OF DEBORAH REYNOLDS, ) ) ) ) | |
| Plaintiff-Appellant, ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. ) ) | |
| BRANDON SZCZESNIAK, et al. ) ) | OPINION |
| Defendants-Appellees. ) ) | |

Before: BATCHELDER, NALBANDIAN, and READLER, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. On a late summer's night in 2018 in Ferndale, Michigan, police officers found Deborah Reynolds sitting outside a 7-Eleven convenience store with DeAngelo Martin standing by her side. The officers asked Reynolds and Martin several questions, attempted to administer breathalyzer tests, and ticketed Reynolds for possession of an open intoxicant. The officers, misunderstanding the relationship between Reynolds and Martin, drove them to a gas station in Detroit and left them there together. Reynolds was never seen alive again. Months later, authorities found Reynolds's body in an abandoned house in Detroit.

Reynolds's estate sued the City of Ferndale, the Ferndale police officers involved in the encounter, and Martin, asserting a substantive due process claim, an equal protection claim, a *Monell* claim, and a state-law claim for gross negligence. The district court remanded the suit against Martin to state court, dismissed the federal claims against the Ferndale defendants, and remanded the remaining state-law claims to state court. We AFFIRM.

## I.

### A. Ferndale Police Officers' Encounter with Reynolds and Martin

Around 1:00 a.m. on August 3, 2018, the Ferndale Police Department received a report of "suspicious individuals" at a 7-Eleven convenience store located in Ferndale, Michigan. Three Ferndale police officers, each driving a separate police vehicle, responded to the report. From this point forward, the officers' body and dash cameras recorded the entirety of the encounter.

Officer Brandon Szczesniak arrived at the 7-Eleven first, where he observed four individuals on the sidewalk outside of the 7-Eleven store. One of them, an African-American woman later identified as 64-year-old Deborah Reynolds, was sitting in a lawn chair on the sidewalk "drinking a 24 oz Natty Ice." Another was an African-American man standing next to Reynolds who was later identified as 34-year-old DeAngelo Martin. The other two individuals, an unidentified man and woman who appeared to be Caucasian, were talking with Martin.

On approach, Szczesniak addressed only Reynolds and Martin: "How's it going, ma'am, how's it going, sir?" Reynolds responded: "We doing fine." The unidentified man and woman started to walk away but before leaving, the man asked Szczesniak if he needed them for anything to which Szczesniak replied, "No, we're okay, thank you." Officer Lauren Zyrowski arrived shortly thereafter.

Szczesniak asked Reynolds if the beer on the ground belonged to her, and she replied that "it was sitting out here when we came." Szczesniak then asked Martin to sit down, prompting Reynolds to beckon Martin to "come over here, baby." Martin presented himself to the officers as an individual with severe hearing and speech disabilities. When the officers asked Martin for identification, he became alarmed and flustered, and communicated to the police officers—using barely decipherable words and hand gestures—that he wanted to go home. Eventually, Martin

2

wrote down his full name and date of birth for the officers. Meanwhile, Reynolds appeared intoxicated and confused, slurring her speech and asking the officers several times, "what the hell is going on?" Despite her apparent impaired state, Reynolds gave Szczesniak her full name and date of birth. Szczesniak returned to his vehicle to search for Reynolds and Martin on the police databases.

By this point, Officer Pawel Skomski had arrived. Skomski asked Martin and Reynolds where they lived. Martin did not respond, but Zyrowski recalled aloud that a few months earlier, she had dropped Martin off at the intersection of John R. Street and State Fair Avenue in Detroit. Reynolds told the officers that Martin did not live with her, but Martin insisted that Reynolds was with him. Skomski asked Reynolds how much she had had to drink, and Reynolds, appearing offended and upset by the question, denied that she had drunk anything. When Martin motioned to Reynolds that she should calm down, she seemed to listen, saying "okay, okay," and telling the officers in a less hostile tone that she "ain't no damn drunk."

Skomski administered breathalyzer tests to Martin and Reynolds. Martin tested 0.19— twice the legal limit, *see* Mich. Comp. Laws § 257.625, but Skomski could not get a testable sample from Reynolds.

Skomski then phoned his sergeant and obtained approval to take Martin and Reynolds to Detroit. Skomski again asked Martin and Reynolds where they lived and Martin said that they stayed with a cousin near State Fair Avenue and Woodward Avenue in Detroit.[1] When Skomski again asked Reynolds if she stayed with Martin, Reynolds did not answer, but Martin continued to

---

[1] The intersection at State Fair Road and Woodward Avenue is approximately one mile away from the intersection where Zyrowski recalled taking Martin a few months prior to this incident.

insist that she was with him. Taking Martin's word for it, Skomski decided to drop them off together at the same location. Reynolds did not object.

Skomski then checked in on Szczesniak who had tried unsuccessfully to find Martin on the police databases. Skomski could not find Martin either, so they abandoned their efforts, and returned to the scene to escort Reynolds and Martin to the police vehicles. Before going to the police vehicles, however, Szczesniak served Reynolds with a ticket for an open intoxicant. Martin, with his arm around Reynolds, offered to hold the ticket for Reynolds. Reynolds did not object to Martin's arm around her or Martin's holding her ticket for her.

## B. The Officers Take Reynolds and Martin to Detroit

The officers escorted Martin and Reynolds to the police vehicles to take them to Detroit. The officers arranged for Reynolds to ride in Zyrowski's vehicle and for Martin to ride in Skomski's vehicle. Reynolds, appearing confused, declared that she just wanted to go home. Zyrowski, to persuade Reynolds to get in the police vehicle, told her that she planned to take Reynolds to the same place Skomski intended to take Martin, and told her as well that she planned to take her home.[2] Martin also prodded Reynolds to go with Zyrowski. Reynolds eventually got into Zyrowski's police vehicle, and Martin entered Skomski's vehicle without incident. With both Reynolds and Martin inside the police vehicles, Skomski said to the others, "alright, let's get them out of our city."

Skomski and Zyrowski drove Martin and Reynolds to Detroit. En route, Skomski searched for Martin on the police databases once more, but that search appeared to be fruitless as well.

---

[2] The police officers knew or should have known of Reynolds's home address because the open intoxicant citation that Szczesniak served on Reynolds included her home address and county. At the very least, Szczesniak knew of Reynolds's home address because he wrote the citation and served it on Reynolds.

Meanwhile, in Zyrowski's vehicle, Reynolds told Zyrowski several times that "Your baby gonna die. Watch." Zyrowski apparently took Reynolds's comments to mean that Zyrowski's baby was going to die because she later quipped to Skomski that Reynolds had put a hex on her.

Skomski and Zyrowski dropped Martin and Reynolds off at a Sunoco gas station near the corner of State Fair Road and Woodward Avenue. No one saw Reynolds alive again. Reynolds's family filed a missing person report with the City of Ferndale, and in December 2018, a decomposed body was found in an abandoned house near the Sunoco gas station. Authorities later identified the body as that of Reynolds. By 2019, Wayne County prosecutors had charged Martin with the murders of four other African-American women over the age of 50. Martin is also under investigation for his involvement in Reynolds's death.

### C. Procedural History

Andre Reynolds, brother to Deborah Reynolds and personal representative of her estate (the "Estate"), sued Szczesniak, Zyrowski, Skomski, the City of Ferndale, and Martin in state court. The Estate brought wrongful death claims against all defendants, a substantive due process claim against the Ferndale police officers and the City of Ferndale, and a *Monell* claim against the City of Ferndale. The defendants removed the case to federal court. The district court declined jurisdiction over the state-law claim for wrongful death against Martin and remanded that claim to state court. The Estate then amended the complaint by adding an equal-protection claim and a gross negligence state-law claim against the Ferndale police officers and the City of Ferndale, and in January 2021, the defendants filed a motion to dismiss the case. The district court granted the defendants' motion, dismissed the federal claims, and remanded the gross-negligence state-law claim to state court. The Estate appeals.

5

## II.

### A.  Standard of Review

"We review a district court's grant of a motion to dismiss de novo." *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020).  To survive a motion to dismiss, the plaintiff must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted).  A plausible claim must allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *id.*, and the claim's allegations must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

This standard requires that "[w]e construe the complaint in the light most favorable to [the plaintiff], accept [the plaintiff's] allegations as true, and draw all reasonable inference in [the plaintiff's] favor." *Bailey v. City of Ann Arbor*, 860 F.3d 382, 385 (6th Cir. 2017).  While "our decision rests primarily upon the allegations of the complaint," *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008), we may consider exhibits attached to the complaint "so long as they are referred to in the [c]omplaint and are central to the claims contained therein," *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015) (quotation omitted).

Here, the Estate offered all of the available body and dash camera footage from the police officers as exhibits attached to the complaint.  What's more, the complaint references the video exhibits, and those video exhibits captured the central events upon which the Estate's claims rely.  Finally, neither party contested the inclusion of the videos in the district court's review of the complaint, nor do they contest inclusion of the videos now.  *See Garcia v. Does*, 779 F.3d 84, 87 n.2 (2d Cir. 2015) (declining to decide whether Federal Rule of Civil Procedure 10(c) allowed the district court to consider videos attached as exhibits to the plaintiff's complaint because neither party contested the videos' inclusion as part of the court's review of the complaint).  Hence, in our

review, we consider the video exhibits and accept the complaint's allegations as true only to the extent that the complaint's allegations are not contradicted by the video exhibits. *See Bailey*, 860 F.3d at 386–87 (holding that the court is not required to favor the plaintiff's allegations when they are entirely contradicted by objective video evidence).

The Estate challenges the district court's dismissal of its substantive-due-process and equal-protection claims, as well as its *Monell* claim against the City of Ferndale. We address each challenge individually.

## B. Substantive Due Process

The Estate claims that the defendants violated Reynolds's substantive-due-process rights. It alleges that the Ferndale police officers took Reynolds into custody, and then abandoned her in a high-crime area with Martin, an individual unknown to Reynolds. It further alleges that the Ferndale police officers' actions toward Reynolds demonstrated a deliberate indifference that caused Reynolds to be sexually assaulted and murdered by Martin.

The Due Process Clause of the Fourteenth Amendment says that no state shall "deprive any person of life, liberty, or property, without due process of law." While the Clause sounds in procedure, the Supreme Court has read it to protect substantive rights. *See Lipman*, 974 F.3d at 740–41 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). The Due Process Clause protects against government intrusions—not private intrusions—on substantive rights and generally does not impose affirmative duties on a state to protect its citizens from harm done by private actors. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989).

But in *DeShaney*, the Court said, "[w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything

7

to render him any more vulnerable to them." *Id.* at 201. We have since read this language to create two exceptions to *DeShaney*'s rule: (1) the state-created danger doctrine; and (2) the custodial exception. *See Lipman*, 974 F.3d at 741–42. The Estate alleges that both exceptions apply to Reynolds.

*State-created danger doctrine.* A state-created danger claim has three elements, and to state a claim under that doctrine, the plaintiff must allege all three. First, the state official(s) must "take an affirmative act that either creates or increases the risk that the plaintiff will be exposed to private acts of violence." *Doe v. Jackson Loc. Sch. Dist. Bd. of Ed.*, 954 F.3d 925, 932 (6th Cir. 2020) (cleaned up). Next, the risk exacerbated by the state official(s) must exceed the risk of general harm to the public from a private actor. *Id.* And third, the official(s) must act with deliberate indifference to the risk that they created. *Id.* at 933. Here, the Estate's claim fails on the third element because it has not alleged, nor do the videos reflect, facts that establish that the Ferndale police officers acted with deliberate indifference.

The deliberate-indifference element requires "extreme misconduct" on the part of the state officials. *Id.* Extreme misconduct is more than a negligent mental state, but can be less than an "actual intent to harm." *Id.* As is the case here, we apply the deliberate-indifference standard in cases in which state officials have the opportunity to make "unhurried judgments." *Id.*

The deliberate-indifference standard has two parts. For the first part, the official(s) must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002) (citation omitted). This requires a set of facts that allow for an inference that the official knew "of more than a *general* risk of harm." *Doe*, 954 F.3d at 934. In other words, the official must at least have been aware of the specific risk of harm to the plaintiff that later

develops. *Id.* at 932 (rejecting a "should-have-known framework," as that comes close to suggesting a "classic negligence formulation") (citation omitted). *Doe* is instructive on this point. There, a kindergarten student and her parents sued the school board and five school employees under the state-created danger doctrine for allowing a fifth grader to sexually assault the kindergartner on the school bus. *Id.* at 929–30. But we held that the school employees did not act with deliberate indifference. While those employees knew of the fifth grader's "poor judgment, bullying tendencies, and dishonesty," they did not know of any facts suggesting that the fifth grader posed a risk of intentional sexual assault. *Id.* at 935; *see also McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469–70 (6th Cir. 2006) (holding that the school official did not act with deliberate indifference because the student's past disruptive and violent behavior did not mean that the official knew of the specific risk that the student would have a gun and fatally shoot another student when the school official left the classroom for a moment).

To satisfy the standard's second part, the alleged facts must show that the official's response to the risk of specific harm was "conscience shocking." *Doe*, 954 F.3d at 934 (quotation omitted). This requirement "ensures that 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Hence, the second part requires that the plaintiff allege "that the police knowingly and unreasonably opted for a course of conduct that entailed a substantially greater total risk than the available alternatives." *Ewolski*, 287 F.3d at 515 (quotation omitted).

Here, the Estate has not alleged facts that establish deliberate indifference on the part of the police officers. The facts, as alleged in the complaint and as depicted in the videos, do not permit a reasonable inference that the officers knew of the specific risk that Martin posed to

Reynolds. In fact, the videos show that Reynolds and Martin appeared to be well-acquainted with each other, and, based on their interactions with each other as shown on video, it was reasonable to infer that they had been spending time together that night. For example, when Szczesniak asked Reynolds if the beer on the ground belonged to her, she replied that "it was sitting out here when *we* came." (emphasis added). At one point, Reynolds asked Martin, "are you doing alright baby?" At another, Reynolds did not object to Martin's putting his arm around her, nor did she object to Martin's holding her open-intoxicant citation for her.

The complaint and videos are also devoid of facts suggesting that the police officers knew that Martin had the propensity to rape and murder women similar to Reynolds. As the district court explained, the officers "did not know, and had no reason to know or even suspect, that Martin would later be arrested for the murders of multiple women in a similar demographic to Reynolds." *Reynolds v. City of Ferndale*, 545 F. Supp. 3d 533, 540 (E.D. Mich. 2021). We agree with the district court.

Moreover, the officers' lack of knowledge was not for want of investigating. Szczesniak, for example, spent much of the encounter at the 7-Eleven store in his vehicle attempting, in vain, to find Martin's information on the police databases. Skomski also searched for Martin on the police databases, but found nothing. It is true that Zyrowski recognized Martin, but it was only to the extent that she had given him a ride out of Ferndale into Detroit a few months prior to the incident with Reynolds. And while Zyrowski suspected that Martin lied to the officers about his personal information, suspicions about a person's dishonesty do not necessarily give rise to suspicions that the person is prone to rape or murder. *See Doe*, 954 F.3d at 935; *McQueen*, 433 F.3d at 469–70.

On appeal, the Estate argues that Martin's intoxication, apparent homelessness, erratic behavior, and relative youth indicated that the officers knew of the specific risk that Martin posed to Reynolds. But none of these facts suggested that Martin posed the specific risk that later developed into the apparent murder of Reynolds. Recall that, in *Doe*, the perpetrator's previous behavioral problems did not support an inference that school officials knew of the specific risk of sexual assault that he later committed. 954 F.3d at 935. So too here. Martin's intoxication, homelessness, and odd behavior cannot support an inference that the officers knew of the specific risk that Martin posed to Reynolds.

In any event, the videos depict Martin as less erratic and dangerous than the Estate alleges. While Martin appeared alarmed when the officers first arrived, the way he acted and communicated reasonably suggested that he was both willing and able to take care of an impaired Reynolds, much as one friend would take care of another. For example, Martin told the officers that Reynolds was to come with him, and Reynolds did not object. At another point, when Szczesniak served the apparently impaired Reynolds with a citation for an open intoxicant, Martin offered to hold the citation for Reynolds. Again, Reynolds did not object. And, earlier, when Reynolds had grown combative with the officers when they asked her if she was drinking that night, Martin attempted to calm her—and in fact, it appeared that he did calm her. Therefore, the videos do not support even a reasonable inference that the officers knew of the specific risk to Reynolds that later developed such that the officers could be found to have acted with deliberate indifference.

In the alternative, the Estate argues that the alleged facts indicated that the officers knew of and disregarded the specific risk of harm posed by "other opportunistic predators." The Estate

insists that the officers knew of this risk because they abandoned her at a Sunoco gas station in a high-crime area in Detroit.

It is true that if the officers had abandoned Reynolds in a known high-crime area by herself, our analysis might be different. *See, e.g.*, *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989) (holding that the police officer acted with deliberate indifference by dropping a victim off in a high-crime area where she was later assaulted and raped). But the officers did not leave Reynolds alone; rather, they left her with Martin, who appeared to be a friend who wanted to assist Reynolds in her impaired state. That the officers reasonably misunderstood Reynolds and Martin's relationship does not lead to a necessary inference that the officers acted with deliberate indifference towards the risk of harm posed by criminal predators in high-crime areas of Detroit. Though the officers were mistaken, the deliberate-indifference element requires a more culpable mental state than what was alleged here. *See Ewolski*, 287 F.3d at 513.

In sum, whether Martin or an unknown predator posed a risk of harm to Reynolds, the allegations fail to establish that the officers knew of those specific risks such that they acted with deliberate indifference towards Reynolds. Because the complaint fails to plead facts demonstrating deliberate indifference, it fails to satisfy the necessary third element of the state-created danger exception to the *DeShaney* rule.

*The Custodial Exception.* The Estate also alleges a claim under the custodial exception. This exception applies to injuries that the plaintiff suffers while in the state's custody or when the state releases the plaintiff from custody "in a manner that increases her risk compared to the status quo." *Lipman*, 974 F.3d at 742–43. Similar to the state-created danger doctrine, the custodial exception requires that the state official(s) act with deliberate indifference to the risk of harm to the plaintiff. *See Salyers v. City of Portsmouth*, 534 F. App'x 454, 459–60 (6th Cir. 2013) (quoting

*Stemler v. City of Florence*, 126 F.3d 856, 870 (6th Cir. 1997) (holding that the plaintiff can recover under the custodial exception if the plaintiff's injury "occurred as a result of the state's deliberate indifference to the risk of such an injury")).

Here, for the same reasons that the Estate failed to allege facts sufficient to demonstrate deliberate indifference under the state-created danger doctrine, the Estate also fails to allege facts that show that the officers acted with deliberate indifference upon Reynolds's release from the officers' custody. Therefore, the district court did not err by dismissing the Estate's custodial exception claim.

Our decision today should not be read to minimize Reynolds's loss of life or the suffering and sorrow Reynolds's loved ones have had to endure. Substantive due process claims brought under the exceptions to *DeShaney* require a demanding standard for plaintiffs because the Federal Constitution does not "supplant" state tort law, *see Daniels v. Williams*, 474 U.S. 327, 332 (1986); rather, the Constitution "supplements" state tort law, *see Doe*, 954 F.3d at 938. For that reason, a plaintiff must allege extreme misconduct rather than negligence or some less-culpable mental state. Here, while there may have been negligent misconduct on the part of the officers, it was not extreme misconduct that rises to the level of constitutional error. Therefore, we must affirm the district court's dismissal of the Estate's substantive due process claim.[3]

### C. Equal Protection

The Estate also alleges that the City of Ferndale and its police officers violated Reynolds's rights under the Equal Protection Clause. "The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or

---

[3] The defendants also argue that they are entitled to qualified immunity on this substantive due process claim. Because the Estate has failed to allege facts necessary to establish a substantive due process claim under either *DeShaney* exception, we need not address qualified immunity.

(3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). Here, the Estate alleges that the defendants targeted a suspect class.

To state such a claim, the Estate must adequately allege two threshold elements: (1) that the state "treated the plaintiff disparately as compared to similarly situated persons"; and (2) that "such disparate treatment . . . targets a suspect class." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation omitted). Here, the Estate alleges the following:

- Defendant Officers, all of whom are White, subjected Ms. Reynolds, who is Black, to unequal treatment under the law when they seized and transported her "out of our City" to the mostly Black populated City of Detroit.

- Defendant Officers were predisposed to treat Black people differently from similarly situated White people and/or were trained, instructed, and expected to do so.

- Had Ms. Reynolds been White, Defendant Officers would not have treated her in the manner described above.

- Had Ms. Reynolds been a similarly situated White citizen, Defendant Officers would not have taken her into custody, transported her against her will in the dead of night to the City of Detroit where she did not live, with a 34-year-old intoxicated Black male (DeAngelo Martin) she was not with and who the Officers could not identify, and abandon her alone with Martin with nowhere to go.

The district court concluded that the complaint did not adequately allege an equal protection claim because the allegations did not identify a similarly situated Caucasian person or a case comparable to Reynolds's case. *See Reynolds*, 545 F. Supp. 3d at 541. We agree with the district court.

Bare assertions and conclusory allegations "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. The pleading standards of *Iqbal* and *Twombly* require additional supporting details before the pleadings are taken as truth. *Id.* at 681. In *Napolitano*, for example, the plaintiffs brought an equal protection claim alleging that the federal government treated them with disfavor

14

"on account of [the p]laintiffs' viewpoint on certain political issues." 648 F.3d at 379. But we found that the claim was implausible because the complaint did not provide necessary details that identified a similarly situated individual or organization of a different political viewpoint that did not receive the same treatment from the government as did the plaintiffs. *Id.* at 379–80.

The Estate's claim fails for the same reason. The Estate did not identify anyone similarly situated to Reynolds who received more favorable treatment. Conclusory allegations that a hypothetical Caucasian comparator would have received more favorable treatment are not entitled to an assumption of truth. *Iqbal* and *Twombly*'s pleading standards require more. *See, e.g.*, *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009) (affirming dismissal of the plaintiff's equal protection claim because the complaint failed to state facts that showed "some evidence that the people *not* disciplined were similarly situated and of a different race").

On appeal, the Estate argues for a remand to provide it the opportunity to engage in discovery to find a similarly situated Caucasian comparator. It also argues that we should not require more specific allegations because that would impose too heavy an evidentiary burden at the pleading stage. But discovery is not needed for the Estate to sufficiently allege disparate treatment. For example, the Estate might have been able to seek public records and to allege based on those records that the City of Ferndale police treated similarly situated Caucasian people differently than they treated Reynolds who was an African American. Or the complaint could have alleged that the police officers did not follow proper procedure in removing Reynolds to Detroit, which—at the motion-to-dismiss stage of the proceeding—*might* have been enough to support a reasonable inference of disparate treatment that targeted a suspect class. Instead, the Estate presented nothing but conclusory allegations bereft of supporting details. These allegations

15

fail to meet the pleading standards under *Iqbal* and *Twombly*. Therefore, the district court did not err by dismissing the Estate's equal protection claim.[4]

## D. *Monell* **Claim**

The Estate also brought a *Monell* claim against the City of Ferndale. "[A] local government can be sued under § 1983 only when a policy or custom of the government caused the injury in question." *Lipman*, 974 F.3d at 747; *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). However, a city "can only be held liable if there is a showing of an underlying constitutional violation by the [city's] officials." *Andrews v. Wayne County*, 957 F.3d 714, 725 (6th Cir. 2020).

Here, the Estate has failed to allege an underlying constitutional violation committed by Ferndale's police officers. Therefore, the Estate cannot state a *Monell* claim.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[4] Because the Estate has failed to allege facts necessary to state an equal-protection claim, we need not address the defendants' claim of qualified immunity.