RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0094p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MACHELLE PEARSON, et al.,

                *Plaintiffs-Appellees*,

  v.

MICHIGAN DEPARTMENT OF CORRECTIONS,

                *Defendant*,

HEIDI E. WASHINGTON, et al.,

                *Defendants-Appellants*.

Nos. 24-1526/1528

_____

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-10707—Stephen Joseph Murphy, III, District Judge.

Argued: June 11, 2025

Decided and Filed: March 26, 2026

Before: WHITE, LARSEN, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Rebekah L. Bailey, NICHOLS KASTER, PLLP, Minneapolis, Minnesota, for Appellees. **ON BRIEF:** Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Rebekah L. Bailey, Matthew H. Morgan, Grace I. Chanin, NICHOLS KASTER, PLLP, Minneapolis, Minnesota, Cary S. McGehee, Beth M. Rivers, Channing Robinson-Holmes, PITT MCGEHEE PALMER BONANNI & RIVERS PC, Royal Oak, Michigan, Jonathan R. Marko, MARKO LAW, PLLC, Detroit, Michigan, David S. Steingold, Samantha M. Baker, LAW OFFICES OF DAVID S. STEINGOLD, PLLC, Detroit, Michigan, for Appellees.

      MURPHY, J., delivered the opinion of the court in which LARSEN, J., joined. WHITE, J. (pp. 20–30), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

MURPHY, Circuit Judge.   High-level prison officials cannot operate prisons by themselves.  They must assign many duties to others.  This case requires us to consider when these officials might violate the Eighth Amendment if the contractors tasked with providing medical care and preventing the spread of infectious diseases perform incompetently.   For several years, women detained in a Michigan prison suffered from painful rashes.  Their medical providers mistakenly ruled out a contagious condition: scabies.  Much later, though, an outside dermatologist found that these providers had misdiagnosed the women and that scabies had spread through the prison.  Four inmates incarcerated during this time seek damages not just from the medical providers but also from various prison officials who did not treat them.  The district court held that the complaint plausibly pleaded that all defendants committed "clearly established" violations of the Eighth Amendment.  It thus denied the defendants' request for qualified immunity.  The non-treating prison officials have appealed.  And we agree with them that our precedent would not have clearly conveyed that their reliance on the front-line medical providers was so unreasonable as to violate the Eighth Amendment.  On the other hand, the inmates adequately pleaded that these officials were the proximate cause of their injuries under Michigan law.  We thus reverse the district court's denial of qualified immunity and affirm its denial of state-law immunity.

I

This case arises at the pleading stage.  So we will describe the events using the operative complaint's well-pleaded factual allegations (in contrast to its legal conclusions).  *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507, 511 (6th Cir. 2020).

A

The Huron Valley Correctional Facility for Women (or "Huron Valley" for short) houses over 2,000 incarcerated women in Washtenaw County, Michigan.  Am. Compl., R.114, PageID 1362.  The Michigan Department of Corrections ("MDOC") has contracted with Corizon Health

to provide health care to inmates in its prisons, including Huron Valley. *Id.*, PageID 1387. Under this contract, Corizon (along with its "Infectious Disease Coordinator") accepted the duty to combat "infectious diseases" at Michigan prisons. *Id.*, PageID 1387–88. Yet these efforts have proved ineffective at Huron Valley. This overcrowded, "filthy and dangerous" facility has allegedly become "a breeding ground for communicable diseases and pests." *Id.*, PageID 1362.

One such outbreak allegedly started around November 2016. *Id.*, PageID 1365. At that time, some inmates noticed mysterious "red bumps" on their bodies. *Id.* They complained "about horrible itching and rashes they were developing." *Id.* But "guards, nurses, physician assistants, and physicians" "largely . . . ignored" their complaints for a long time. *Id.*

At some unknown point, prison officials considered the possibility that the inmates with these red bumps might have "scabies." *Id.*, PageID 1366. Scabies occurs when parasitic mites burrow into the outer layers of human skin and lay eggs. *Id.*, PageID 1355, 1363. The condition looks like a rash. *Id.*, PageID 1363. It can cause "horrendous, unbearable itching pain" that can lead to mental distress. *Id.*, PageID 1355–56, 1363. And if a person scratches the "small red bumps, welts or scaly lesions" too much, the scratching can create open sores that bleed. *Id.*, PageID 1363. The sores also can get infected and become permanent scars. *Id.*, PageID 1364. The itching sensation gets worse at night and can make it hard for infected individuals to sleep. *Id.* To make matters worse, scabies is "contagious" and can spread through "skin-to-skin" contact or through sharing "personal items" like clothes or towels. *Id.*, PageID 1363.

In early 2018, prison officials "'ruled out' scabies as the main source of the rash outbreak." *Id.*, PageID 1366. They coordinated with "dermatologists" to examine and test "some affected" inmates. *Id.* Yet "their testing and medication recommendations" did not identify scabies or cure the outbreak. *Id.*, PageID 1366–67, 1369. One official later speculated that this testing did not identify scabies because the dermatologists had taken samples using "inaccurate scraping methods." *Id.*, PageID 1367. Lacking a scabies diagnosis, prison officials did not "assemble an outbreak team"—something that the "Scabies Prevention and Control Manual" recommends. *Id.*, PageID 1369.

Officials still tried to combat the rash. They "administered" a "prescription steroid cream" (among other "creams") to affected inmates. *Id.*, PageID 1367, 1420, 1424. But this treatment did not work. The itching got so bad that some inmates resorted to "pouring bleach mixtures on their body in the shower." *Id.*, PageID 1367. Others "contemplated suicide to escape the daily onslaught of persistent, painful itching." *Id.*, PageID 1429. In late 2018, prison officials began to blame the rash on the way the inmates washed their clothing. *Id.*, PageID 1369. The inmates had been "using prison-issued cleaning fluids" and "'homemade' laundry detergent" to personally wash their clothing instead of sending it "to the prison laundry." *Id.* By October 2018, inmates also began to receive the same rote response to complaints: "Healthcare is continuing to investigate the cause of said rashes. Healthcare and corrections are looking into [a] possible environmental cause of the rash." *Id.*, PageID 1417. By December, about 10% of the prison population (almost "200 women") suffered from the rashes. *Id.*, PageID 1368.

At the end of 2018, prison officials reconsidered whether inmates with rashes had scabies. *Id.*, PageID 1367, 1370. They were helped by Dr. Walter Barkey, a private dermatologist. *Id.*, PageID 1368. Barkey had heard about the mysterious rashes from a friend who had a daughter detained at Huron Valley. *Id.* He requested access to the facility to examine inmates. *Id.* Prison officials eventually obliged. *Id.* Barkey found "live mites from skin scrapings of some women" and diagnosed them with scabies. *Id.* Around this time, medical personnel began to treat some women "for scabies," and prison personnel gave them fresh "clothing and bed linens[.]" *Id.*

In early 2019, officials also started to take broader efforts "to treat all 2,070 women inmates for scabies after Dr. Barkey's visit." *Id.*, PageID 1370. They "quarantine[d] infested individuals" and "disinfect[ed] their surroundings[.]" *Id.* They also treated the scabies using various medications, including Ivermectin. *Id.*, PageID 1375. But these efforts did not entirely eradicate the outbreak. *Id.* Some inmates had to quarantine "multiple times" and receive "up to seven or eight doses of the prescribed medication" for scabies. *Id.*, PageID 1370. Even as late as November 2019, officials had to lock down one portion of the prison and give "two more doses of Ivermectin" because of the continued "outbreak." *Id.*

B

At various times throughout the outbreak, Huron Valley housed the four named plaintiffs: Machelle Pearson, Maria Sheldon, Rachell Garwood, and Rebecca Smith. *Id.*, PageID 1357–58. Pearson served time at Huron Valley from December 2016 until June 2017. *Id.*, PageID 1357, 1371. Soon after her arrival, she noticed rashes on "her feet and thighs." *Id.*, PageID 1371. The rashes caused "significant itching" and emotional distress. *Id.* They also caused "scarring" on her feet, ankles, back, and thighs. *Id.*, PageID 1366, 1371. She complained to Huron Valley's "health care unit" over 10 times. *Id.*, PageID 1371. Medical staff responded by giving her "unhelpful creams and a pill intended to treat worm infestations," but a dermatologist never saw her. *Id.* MDOC later paroled Pearson in August 2018. *Id.*, PageID 1357.

Sheldon served time at Huron Valley from July 2018 until February 21, 2019. *Id.*, PageID 1358, 1372. She, too, began to suffer from itchy rashes almost immediately upon her arrival. *Id.*, PageID 1372. She first reported the issue in August 2018, and medical staff told her that "she was suffering from mosquito bites." *Id.*, PageID 1372–73. She then saw a doctor in September or October. *Id.*, PageID 1373. The doctor opined that she might have scabies and tested her, but the tests came back negative. *Id.* So she did not receive the promised medication. *Id.* An "outside dermatologist" (potentially Dr. Barkey) later diagnosed her with scabies in December 2018. *Id.*, PageID 1373–74. She "received multiple doses of medication[.]" *Id.*, PageID 1374. Yet the prison did not "properly" quarantine her or "effectively" disinfect her "environment," so she struggled to get rid of the rash. *Id.* She got paroled about two months after she left this prison. *Id.*, PageID 1358.

Garwood began to serve her term of imprisonment at Huron Valley in about August 2018. *Id.*, PageID 1358. A month later, prison officials housed her with an inmate who had suffered from (and complained about) a rash. *Id.*, PageID 1374–75. Garwood got the same rash in December, and officials diagnosed her bunkmate with scabies the next month. *Id.*, PageID 1375. But they did not quarantine either inmate, disinfect their living area, or test Garwood for scabies. *Id.* And despite Garwood's repeated request to see a doctor, the "healthcare" officials canceled her appointment and did not reschedule it. *Id.* They instead treated Garwood (along with the rest of the population) with repeated doses of Ivermectin. *Id.* Her rash went away after

the second dose—some three months after she first noticed it. *Id.*, PageID 1375. She remains incarcerated at the facility. *Id.*, PageID 1358.

Smith began her term at Huron Valley in February 2010. *Id.*, PageID 1358, 1376. She noticed a "painful rash" in January 2017. *Id.*, PageID 1376. But prison officials ignored her request for treatment until February. *Id.* At that time, the officials "denied" that she had "any illness or malady" and did not permit her to seek outside treatment. *Id.*, PageID 1376–77. Fast forward to October 2017, and an itchy rash that "resembled insect bites" had returned. *Id.*, PageID 1377. She requested medical help from a nurse in January 2018. *Id.* But the nurse simply told her to "change her soap." *Id.* The next month, the rash covered her body, so she asked for help again. *Id.* But officials ignored her request. *Id.* By April, the rash disrupted Smith's sleep. *Id.* She again requested help, and prison officials again ignored her. *Id.* The same process reoccurred in June: her rash caused her to lose sleep, she asked for help, and she did not receive it. *Id.*, PageID 1377–78. Smith remains incarcerated at Huron Valley. *Id.*, PageID 1358.

Pearson, Sheldon, Garwood, and Smith (whom we will refer to collectively as the "Inmates") brought this suit under 42 U.S.C. § 1983 and Michigan law. The Inmates sought to represent a class of inmates detained at Huron Valley who had suffered a skin rash after November 2016. In the operative complaint, they sued three broad groups of defendants. First, they sued many officials with the Michigan Department of Corrections (the "MDOC Officials"). This group included five high-level MDOC officials: Heidi Washington (MDOC's Director), Kenneth McKee (the Deputy Director for MDOC's Correctional Facilities Administration), Jeremy Bush (an Assistant Deputy Director in the Correctional Facilities Administration), Lia Gulick (the Acting Deputy Director for MDOC's Budget and Operations Administration), and Marti Kay Sherry (the Acting Administrator for MDOC's Bureau of Health Care Services). The group also included four high-level officials who work specifically at Huron Valley: Shawn Brewer (the Warden), David Johnson (a Deputy Warden), Karri Osterhout (a Deputy Warden), and Kristina Fisher (a Health Unit Manager). Second, they sued two doctors at Wayne State University School of Medicine who had contracted with MDOC (the "Wayne State Officials"): Carmen McIntyre (MDOC's Chief Medical Officer) and James Blessman (MDOC's Assistant

Chief Medical Officer).  Third, they sued Corizon Health and five of its employees ("the Corizon Defendants").

The Inmates' operative complaint asserted two general causes of action.  They alleged that all the defendants had been deliberately indifferent to their serious medical needs in violation of the Eighth Amendment.  And they alleged that the MDOC Officials had acted with gross negligence while overseeing their care.  The Inmates sought both monetary and injunctive relief.

The district court dismissed an initial complaint but gave the Inmates time to seek leave to file an amended one.  *See Pearson v. Mich. Dep't of Corr.*, 2020 WL 5291974, at *5 (E.D. Mich. Sept. 4, 2020).  The Inmates filed the now-operative complaint, and the parties engaged in discovery for a time.  But the district court then stayed proceedings to allow for mediation. Corizon filed for bankruptcy during this time, which stayed the litigation even further.

Eventually, the MDOC and Wayne State Officials moved for judgment on the pleadings. The district court denied their motions.  *See Pearson v. Mich. Dep't of Corr.*, 2024 WL 2131718, at *8 (E.D. Mich. May 13, 2024).  The court concluded that the Inmates adequately alleged two Eighth Amendment claims.  *See id.* at *2–5.  Turning to the remedies, the court held that the Inmates could seek forward-looking injunctive relief because the complaint alleged that the constitutional violations were continuing.  *See id.* at *2.  It also held that they could seek damages because the complaint alleged a violation of clearly established law to overcome any qualified-immunity defense.  *See id.* at *5–6.  Lastly, the court explained that the Inmates' gross-negligence claims were, in fact, ordinary negligence claims.  *See id.* at *7.  And it held that they rebutted the MDOC Officials' request for state-law immunity by alleging that these Officials had proximately caused their harms.  *See id.* at *7–8.

II

The MDOC and Wayne State Officials have appealed the district court's denial of their motions for judgment on the pleadings.  We begin by identifying the narrow issues before us.  To start, while the Inmates have sought to certify a class, the district court has yet to do so.  We thus may consider only the Inmates' individual claims.  *See Smith v. Bayer Corp.*, 564 U.S. 299,

313 (2011). Next, we have jurisdiction over the appeal only under the collateral-order doctrine. *See Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009). That doctrine allows us to review the district court's denial of qualified immunity on the Inmates' damages claims under the Eighth Amendment. *See id.* at 671–75. And it allows us to review the court's denial of state-law immunity on the negligence claims. *See Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2019) (per curiam). We review a denial of judgment on the pleadings de novo, applying the same rules that govern a motion to dismiss the complaint. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020). We will consider the two sets of immunities in turn.

## A. Qualified Immunity on the Eighth Amendment Claims

Plaintiffs must meet two well-known elements when defendants invoke a qualified-immunity defense at the pleading stage in a § 1983 suit. *See Crawford v. Tilley*, 15 F.4th 752, 762–63 (6th Cir. 2021). They first must plead facts that plausibly establish that the defendants violated a constitutional right. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Iqbal*, 556 U.S. at 681–83. They next must show that the right was "clearly established" at the time the defendants acted. *Wesby*, 583 U.S. at 63 (citation omitted). We may address these elements in the order that best fits the case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Given the novelty of the Inmates' claims, we find it prudent to jump immediately to step two. At that step, plaintiffs must show that state officers violated a "clearly established" right. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). A right qualifies as "clearly established" only if all reasonable officials would have recognized that their conduct "violate[d] that right." *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This standard typically prohibits plaintiffs from identifying the right at a high level of generality. *See Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017). For example, they generally cannot overcome qualified immunity by claiming that it is clearly established that "the Fourth Amendment bars the police from using excessive force." *Beck v. Hamblen County*, 969 F.3d 592, 600 (6th Cir. 2020). That generic framing will not "clearly establish" that an officer's *specific* use of force exceeded constitutional bounds except in "obvious" situations that involve egregious force.

*Rivas-Villegas*, 595 U.S. at 6. Typically, then, plaintiffs "must identify a case" with similar enough facts that it would have alerted the defendants that their "specific conduct was unlawful." *Id.* By limiting liability to cases in which a constitutional question is "beyond debate," qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 583 U.S. at 63 (citations omitted).

The Inmates cannot meet this "demanding" test. *Id.* The district court read their complaint to assert two Eighth Amendment claims. The complaint first alleged that the MDOC and Wayne State Officials were deliberately indifferent to the Inmates' "medical need for scabies treatment." *Pearson*, 2024 WL 2131718, at *3. It next alleged that the Officials were deliberately indifferent to the prison conditions that "spread" the scabies. *Id.* at *4. For each claim, though, the Inmates lack caselaw that would have alerted the Officials that their specific conduct violated the law.

## 1. Medical-Needs Claim

The Eighth Amendment prohibits officials from inflicting "cruel and unusual punishments" on those convicted of crimes. U.S. Const. amend. VIII. The Supreme Court has held that officials violate this prohibition if they show "'deliberate indifference' to a substantial risk of serious harm" to prisoners. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). It has added that this rule requires officials to provide "medical care" to prisoners to prevent the "pain and suffering" that might result from their untreated "health conditions." *Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

To prove an Eighth Amendment violation based on the lack of medical care, prisoners must prove objective and subjective elements. *Farmer*, 511 U.S. at 834. Objectively, a medical condition must rise to a "sufficiently serious" level. *Phillips*, 14 F.4th at 534. Subjectively, officials must know "of the facts that show the serious medical need," and they "must personally conclude that this need exists." *Id.* at 535; *see Farmer*, 511 U.S. at 837. Even when officials believe that an inmate has a serious medical need, moreover, they do not act with deliberate indifference" if they "respond[] reasonably to" the need after they learn of it. *Farmer*, 511 U.S.

at 844.  In fact, a response does not exhibit deliberate indifference unless it reaches a culpability level higher "than ordinary negligence."  *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024).

The MDOC and Wayne State Officials argue that the Inmates have met neither the objective nor the subjective element.  They first claim that scabies does not qualify as a "serious medical need"—or at least that the conflicting caselaw on this topic does not clearly establish that it does.  *Compare Ciccone v. Sapp*, 238 F. App'x 487, 489 (11th Cir. 2007) (per curiam), *with Barnes v. Malavi*, 412 F. Supp. 3d 140, 143 (E.D.N.Y. 2019).  In the alternative, these Officials claim that they did not act with "deliberate indifference" to this need.  They lastly argue that our cases have not addressed "an analogous situation" and so did not alert them that they responded unreasonably to the outbreak.  Appellants' Br. 48.

We can resolve this appeal in a narrow way by agreeing with the last of these points.  No case would have given the MDOC and Wayne State Officials "fair and clear warning" that their alleged conduct violated the Eighth Amendment.  *Arrington-Bey*, 858 F.3d at 993 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

At the outset, the Inmates overlook that a § 1983 plaintiff may not prove the Eighth Amendment's elements for all defendants en masse.  Rather, the plaintiff may hold officers liable only for their "own misconduct"—not for the misconduct of coworkers.  *Iqbal*, 556 U.S. at 677.  Yet the Inmates' briefing (and much of their complaint) refers to the eleven MDOC and Wayne State Officials "collectively" without identifying specific actions by specific Officials.  *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934–35 (6th Cir. 2020).  As one example, their briefing asserts that the "Defendants"—as a group—"knew of and repeatedly ignored the excessive risk that the scabies infection" posed to their health.  Appellees' Br. 19.  What is the basis for each Official's knowledge?  What did each Official do in response?  For the most part, the Inmates' briefing does not say.  Still, we opt not to resolve the appeal on these grounds because the Officials did not flag the Inmates' failure to take the required person-by-person approach.

The Officials instead say that they all have one thing in common that should relieve them of liability: they "were not treating medical professionals" at Huron Valley, Appellees' Br. 21,

and so "did not provide direct medical care to" the Inmates, Appellant's Br. 24. The complaint instead alleges that the Corizon Defendants "were directly responsible" for this care. Am. Compl., R.114, PageID 1425. It claims that these "medical professionals (from Corizon)" were "the sole decision makers regarding medical [judgments] for patient care" (even if they were under the general direction of the Chief Medical and Psychiatric Officers). *Id.*, PageID 1392. And the complaint alleges that Corizon offered care to each of the four Inmates. Medical staff treated Pearson's rash with "unhelpful creams and a pill intended to treat worm infestations" sometime between December 2016 and June 2017. *Id.*, PageID 1371. They tested Sheldon for scabies in the fall of 2018, but the results came back negative. *Id.*, PageID 1373. When an "outside dermatologist" later diagnosed her with scabies, medical staff gave her "multiple doses of medication" for this condition. *Id.*, PageID 1373–74. Garwood noticed a rash in December 2018, staff gave her Ivermectin starting in January 2019, and the rash went away in about three months. *Id.*, PageID 1375–76. Smith complained of a rash in 2017 and 2018, but staff told her that she did not have "any illness or malady" and should simply "change her soap." *Id.*, PageID 1376–77.

What "case" would have "clearly established" for the MDOC and Wayne State Officials that they responded unreasonably to the Inmates' rashes by relying on the Corizon practitioners to diagnose and treat them? *Arrington-Bey*, 858 F.3d at 992. Even viewing the factual allegations in the light most favorable to the Inmates, the unconstitutionality of this response was not "beyond debate" at the time of the scabies outbreak. *Wesby*, 583 U.S. at 63 (citation omitted).

Indeed, two general principles might support the Officials' claim that they did not violate the Constitution by relying on the Corizon Defendants. For one thing, the complaint cannot hold them vicariously liable simply because the Corizon Defendants allegedly mistreated their scabies. *See Iqbal*, 556 U.S. at 677. The complaint must instead plausibly allege that the Officials "personally" participated "in the unconstitutional action" in some way. *Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020) (citation omitted). Those who supervised the medical personnel, for example, must have "implicitly authorized, approved or knowingly acquiesced in" the personnel's misconduct in a way that showed their own deliberate

indifference. *Crawford*, 15 F.4th at 761 (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)). The supervisors' "mere failure to act" generally will not suffice to hold them liable. *See id.* (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016)). Here, though, the complaint fails to allege that any of the defendants were "personally involved in the allegedly inadequate medical care" to the Inmates. *Est. of Young v. Martin*, 70 F. App'x 256, 260 (6th Cir. 2003).

For another thing, prison officials do not act with deliberate indifference to a prisoner's medical needs when they "rely on medical judgments made by medical professionals responsible for prisoner care." *Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (citation omitted); *see Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002); *Wingo v. WellStar Health Sys., Inc.*, 160 F.4th 1184, 1191 (11th Cir. 2025). Nothing in the Eighth Amendment holds every prison employee liable for every harm to every prisoner—no matter how far removed the harm is from an employee's job duties. *See Burks v. Raemisch*, 555 F.3d 592, 595–96 (7th Cir. 2009) (Easterbrook, J.). Such a rule would suggest that "lay staff" have a duty to "veto" a medical practitioner's diagnosis. *Hehrer v. County of Clinton*, 161 F.4th 955, 964 (6th Cir. 2025). That is not the law. Instead, a plaintiff must allege some additional action to hold these further-afield officials liable for the medical decisions of medical personnel. *See id.* For example, officers may act "recklessly" if they defer to a prison doctor whom they know "mistreats inmates." *Id.* Here, though, the complaint does not allege that the MDOC or Wayne State Officials took action that would suffice to find that their conduct violated any clearly established exception to the general rule permitting officials to defer to medical advice.

The Inmates' briefing does nothing to prove the contrary. The Inmates first argue that they adequately pleaded that all the MDOC and Wayne State Officials subjectively knew of their serious medical needs because of the "obvious" nature of those needs: noticeable rashes that caused painful itching and produced repeated grievances. Appellees' Br. 18–19 (citation omitted). The Inmates even suggest that a specific Official (Warden Brewer) had knowledge of Garwood's rash "because he signed off on Step 2 of her grievance" (but they do not explain what this fact means). *Id.* at 19; Am. Compl., R.114, PageID 1375–76. True, we have sometimes held

that the "obvious" nature of a risk can provide circumstantial evidence that a defendant believed that the risk existed. *Crawford*, 15 F.4th at 766. But whether the Officials *knew about* the Inmates' medical needs does not resolve the separate question whether they *reasonably responded* to it. And the Inmates identify no precedent "clearly establish[ing]" that these Officials should have second-guessed the Corizon practitioners' treatment decisions for the rashes. *Arrington-Bey*, 858 F.3d at 992.

The Inmates respond that this theory (that the MDOC and Wayne State Officials relied on the Corizon practitioners) "mischaracterize[s]" their complaint. Appellees' Br. 19. According to the Inmates, the complaint alleges that unspecified "Defendants" for years "failed to respond to visible scabies symptoms; ignored requests for treatment; and dismissed repeated complaints and pleas for help without proper evaluation and treatment of symptoms." *Id.* at 19–20. But again, none of the MDOC or Wayne State Officials played a direct role in the Inmates' care, and it was not "beyond debate" that these Officials should have superseded the decisions of those who did provide that care. *Wesby*, 583 U.S. at 63 (citation omitted). Consider Sheldon's treatment. Doctors at first overlooked her scabies but later treated her for that condition when an outside dermatologist diagnosed it. Am. Compl., R.114, PageID 1373–74. Sheldon identifies no case that would have notified, say, Warden Brewer that he had a duty to veto the doctor's initial misdiagnosis and to immediately treat her for scabies based on his own lay diagnosis.

The complaint's allegations also do not justify the Inmates' claim that the MDOC and Wayne State Officials simply "sat back and watched" as scabies spread. Appellees' Br. 22. Rather, the complaint alleges that Corizon doctors "tested" inmates but that the tests came back negative for scabies. Am. Compl., R.114, PageID 1366. The doctors thus "administered" various "creams" to fight the rashes. *Id.*, PageID 1367, 1420, 1424. When they learned that the inmates had scabies, moreover, they "treat[ed] all 2,070 women inmates for scabies[.]" *Id.*, PageID 1370. Admittedly, the complaint alleges that the Corizon practitioners provided incompetent and delayed care because they should have diagnosed scabies sooner. But an Eighth Amendment claim requires more than medical malpractice. *See Phillips*, 14 F.4th at 535. And besides, the Inmates do not explain why non-treating Officials should face liability for this alleged incompetence.

Turning to the qualified-immunity analysis, the Inmates argue that we would act in a "premature" way if we granted the MDOC and Wayne State Officials qualified immunity now. Appellees' Br. 13. But qualified immunity represents an "immunity from suit," so courts must address the defense at the earliest possible point. *See Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019) (quoting *Mitchell*, 472 U.S. at 526). And defendants can assert any defense (including qualified immunity) at the pleading stage when the defect in the plaintiff's claims is "apparent from the face of the complaint[.]" *Crawford*, 15 F.4th at 763. Here, the Inmates' "novel" efforts to hold the non-treating Officials liable for the inadequate care provided by others makes it apparent that qualified immunity protects these Officials even at this early stage. *Id.* at 766.

The Inmates next contend that they had a clearly established "right to medical care" that was "not unreasonably delayed" at the time of the scabies outbreak. Appellees' Br. 24. But this "general right" to medical care "will often not clearly establish" that a defendant unreasonably responded to a serious medical need in a specific case. *Beck*, 969 F.3d at 602–03 (citing *City of Escondido v. Emmons*, 586 U.S. 38, 42–43 (2019) (per curiam)). That claim frames the alleged clearly established right at too "high [a] level of generality" whenever it does not give defendants notice that their specific conduct violated the Constitution. *Mullenix v. Luna*, 577 U.S. 7, 16 (2015) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). And the claim does not provide that notice in this case.

Nor do any of the Inmates' specific cases come close to alerting the MDOC and Wayne State Officials that they had a duty to intervene to fix Corizon's allegedly inadequate care. One case involved a right to safe working conditions, not medical care. *See Rhodes v. Michigan*, 10 F.4th 665, 669, 679–80 (6th Cir. 2021). Another involved an officer's failure to alert medical staff of a prisoner's medical need, something that did not occur here because medical practitioners saw the Inmates. *See Burwell v. City of Lansing*, 7 F.4th 456, 460 (6th Cir. 2021). And still other cases involved claims against treating doctors themselves, so these cases say nothing about claims against officials who are steps removed from those doctors in a prison's organizational chart. *See Murray v. Ohio Dep't of Corr.*, 29 F.4th 779, 783–84, 790–91 (6th Cir. 2022); *LeMarbe v. Wisneski*, 266 F.3d 429, 434, 440 (6th Cir. 2001). All told, the Inmates do not cite a single case holding a prison official responsible for another actor's poor medical

decisions.    Qualified immunity thus protects the MDOC and Wayne State Officials from damages liability on this claim.

## 2. Conditions-of-Confinement Claim

Apart from disregarding a prisoner's health needs, prison officials can violate the Eighth Amendment if they overlook dangerous "conditions" in the prison that might harm prisoners. *Phillips*, 14 F.4th at 534 (citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)).  This conditions-of-confinement claim follows similar objective and subjective elements as a medical-needs claim. Objectively, courts must ask whether the challenged condition posed a "sufficiently serious" risk of harm.  *Wilson*, 501 U.S. at 298; *see Rhodes v. Chapman*, 452 U.S. 337, 347–48 (1981). Subjectively, a defendant must have known that the condition created the risk of injury.  *See Beck*, 969 F.3d at 600.  And for this type of claim, too, defendants do not violate the Eighth Amendment if they "respond[] reasonably" to alleviate the risk that the prison conditions pose to prisoners.  *Farmer*, 511 U.S. at 844.  To show deliberate indifference, then, § 1983 plaintiffs must at least prove that the response rose above the "negligence" level.  *Campbell*, 109 F.4th at 860.

Here, the Inmates argue that the MDOC and Wayne State Officials did not just ignore their scabies; the Inmates also argue that these Officials ignored the risk that this condition would spread in the prison because they did not "properly disinfect the facilities or quarantine the infected women."  Appellees' Br. 29.  The Officials raise the same arguments in response. And we can again resolve the claim based on their narrowest defense: that the Inmates have not identified a case that would have given them "fair and clear warning" that their response violated the Eighth Amendment.  *Arrington-Bey*, 858 F.3d at 993 (quoting *White*, 580 U.S. at 79).

Critically, the complaint alleges that Corizon agreed not just to provide medical care to inmates.  Corizon also agreed to be "responsible for addressing chronic medical conditions including infectious diseases in the prison facilities."  Am. Compl., R.114, PageID 1387.  As part of this agreement, Corizon assigned MDOC "an Infectious Disease Coordinator": Craig Hutchinson.  *Id.*, PageID 1388, 1386.  Hutchinson was "responsible for ensuring proper diagnosis" and "prevention" "of communicable diseases" and "for coordinating a response" to

outbreaks. *Id.*, PageID 1386. Yet Corizon practitioners originally diagnosed the rashes as something other than scabies, *see id.*, PageID 1366, so Hutchinson "chose not to implement adequate policies" to reduce the risk of scabies spreading, *id.*, PageID 1413. Indeed, Corizon practitioners (or other unidentified parties) led the MDOC and Wayne State Officials to believe that the rashes had a non-infectious source: the inmates' improper use of "prison-issued cleaning fluids" and "'homemade' laundry detergent to hand-wash their clothing[.]" *Id.*, PageID 1369. Still, even when Dr. Barkey (the outside dermatologist) diagnosed scabies, Corizon's efforts to "quarantine infested" inmates and "disinfect their surroundings in 2019" were "poor" and "inadequate[.]" *Id.*, PageID 1370.

The Inmates again identify no "case" that would have "clearly established" for the MDOC and Wayne State Officials that they had a duty to overturn the Corizon practitioners' efforts to combat the rashes. *Arrington-Bey*, 858 F.3d at 992. Just as the law did not clearly establish that the Officials had to veto Corizon's *treatment* decisions, so too it did not clearly establish that the Officials had to veto Corizon's *prevention* decisions. After all, officials generally depend on health-care "professionals" for both types of decisions. *Graham*, 358 F.3d at 384; *see Valentine v. Collier*, 956 F.3d 797, 802–03 (5th Cir. 2020). It may be the case that prison officials act with "deliberate[] indifference" by exposing inmates "to a serious, communicable disease[.]" *Helling v. McKinney*, 509 U.S. 25, 33 (1993). But that framing assumes officials are aware that a contagious disease is present. Here, the complaint alleges that the Corizon doctors ruled out scabies. How could the Officials have had a clearly established duty to take prison-wide prevention measures against scabies in 2018 when Corizon doctors told them that the Inmates did *not* have scabies? *Cf. Gibbs v. Grimmette*, 254 F.3d 545, 550 (5th Cir. 2001). And once Dr. Barkey diagnosed scabies, officials did adopt a policy "to quarantine infested individuals" and "disinfect their surroundings in 2019." Am. Compl., R.114, PageID 1370.

To be sure, the Inmates do claim that the front-line personnel incompetently implemented these subsequent quarantine and disinfection policies. *See id.* For example, officers did not quarantine Garwood or her bunkmate or disinfect their cell after a doctor diagnosed the bunkmate with scabies. *See id.*, PageID 1375. They instead simply gave Garwood Ivermectin,

which caused the scabies to go away after the second dose. *See id.*, PageID 1375. But Garwood makes no claim that any MDOC or Wayne State Official "*personally*" participated in the failure to quarantine her bunkmate or disinfect their cell. *Pineda*, 977 F.3d at 490. And she identifies no clearly established law that would hold them responsible for this oversight.

In response, the Inmates point to their general allegations that Huron Valley was "overcrowded" and "filthy," which increased the risk that an infectious condition might spread. Am. Compl., R.114, PageID 1362. They suggest that the MDOC officials oversaw its "budget" and failed to spend enough money to remedy these problems. *Id.*, PageID 1403–04. But they fail to identify any case that identifies when (if ever) high-level prison officials can face liability for failing to spend money to fix these prison conditions. *See Beck*, 969 F.3d at 602.

The Inmates also contend that they may rely on the clearly established "right to safe and sanitary conditions" to overcome qualified immunity. Appellees' Br. 27. But they again frame the right at too "general" of a level. *Wesby*, 583 U.S. at 64. This claim does not "clearly establish[]" that the MDOC and Wayne State Officials unreasonably relied on the medical practitioners' initial opinion that inmates with rashes did not have scabies. *Arrington-Bey*, 858 F.3d at 992. Nor does it "clearly establish[]" that they unreasonably relied on others to implement quarantine and disinfectant policies once doctors diagnosed that condition. *Id.*

True, the Inmates did not need to identify a conditions-of-confinement case about *scabies* rather than some *other disease* (assuming that scabies qualifies as a serious medical need). *See Rhodes*, 10 F.4th at 680. Still, they did need to identify cases that would have told the MDOC and Wayne State officials that they could not rely on the Corizon officials to respond to the condition. And again, none of the Inmates' cases provide the required notice.

Start with *Hutto v. Finney*, 437 U.S. 678 (1978), and *Hope v. Pelzer*, 536 U.S. 730 (2002). Neither case involved the negligent failure to stop the spread of contagious conditions. Rather, *Hutto* concerned an intentional punishment: "punitive isolation" in deplorable conditions. 437 U.S. at 682–83. And *Hope* concerned a similar punishment: handcuffing a shirtless inmate to a "hitching post" for hours in the hot sun with little water and no bathroom breaks. 536 U.S. at 734–35. These cases say nothing about when prison officers

may rely on the decisions of other state actors responsible for the treatment and prevention of infectious conditions.

The Inmates fare no better by invoking *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam). There, an inmate alleged that corrections officers housed him "in a pair of shockingly unsanitary cells." *Id.* at 7. The first cell had human waste everywhere, including on the ceiling and in the sink. *Id.* at 7–8. The second "frigidly cold" cell had only a "clogged drain in the floor" as the bathroom facility. *Id.* at 8. The Supreme Court held that "any reasonable officer should have realized that" these "particularly egregious facts" sufficed to satisfy the objective element of a conditions-of-confinement claim under the Eighth Amendment. *Id.* at 9. It then remanded for the lower court to decide whether each sued official had acted with deliberate indifference to these dangerous prison conditions. *See id.* Here, by contrast, we do not rely on the objective element to grant the MDOC and Wayne State Officials qualified immunity. Rather, we hold that no clearly established law would have alerted them that their reliance on Corizon personnel violated the Eighth Amendment. And unlike *Taylor*, this case is not an "obvious" one in which this reliance was unreasonable. *Id.* (citation omitted). Qualified immunity thus protects these Officials.

### B. State-Law Immunity on Negligence Claims

Plaintiffs who bring negligence claims against state actors in Michigan also must confront its Government Tort Liability Act (GTLA). This Act makes a state official "immune from tort liability" for a plaintiff's harm if (among other things) the official's "conduct does not amount to gross negligence that is the proximate cause of" that harm. Mich. Comp. Laws § 691.1407(2)(c). Unlike federal qualified-immunity law, this state law puts the burden on state officials to prove their entitlement to the immunity. *See Ray v. Swager*, 903 N.W.2d 366, 370 (Mich. 2017).

The MDOC Officials do not dispute that the complaint adequately pleaded their gross negligence. These Officials instead seek immunity from the Inmates' negligence claims on the ground that they were not "the proximate cause" of the Inmates' injuries. Mich. Comp. Laws § 691.1407(2)(c). The Michigan Supreme Court has interpreted the phrase "the proximate

cause" to reach only "the one most immediate, efficient, and direct cause of the injury[.]" *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000); *Hyman v. Lewis*, 27 F.4th 1233, 1238–39 (6th Cir. 2022). And the MDOC Officials claim that we should decide at this pleading stage that the Corizon practitioners' conduct qualifies as the proximate cause under this test. Appellants' Br. 52.

We find this argument premature. Even assuming that the Corizon practitioners were a "more direct cause of" the Inmates' injuries as a *factual* matter, the Michigan Supreme Court has made clear that courts must undertake a more nuanced approach when identifying the *proximate* cause. *Ray*, 903 N.W.2d at 382. To decide on "the proximate cause," a court must do more than engage in the "weighing of factual causes." *Id.* at 376. The court must also decide whether the other allegedly culpable party "was negligent" before it can decide whether this party qualifies as the proximate cause. *Id.* at 377. And it must balance "the legal responsibility" of all the involved actors. *Id.* This fact-bound analysis requires discovery in this case before we can identify all the negligent parties (if any) and decide which of these parties bears the primary responsibility.

\* \* \*

To summarize, the complaint fails to allege facts that would clearly establish that the MDOC and Wayne State Officials violated the Eighth Amendment. Qualified immunity thus protects these Officials from the Inmates' federal claims for damages—at least as those claims are currently pleaded. This conclusion leaves the request for an injunction against these Officials under the Eighth Amendment. It also leaves the Inmates' Eighth Amendment claims against the Corizon Defendants. And it leaves the Inmates' negligence claims against the MDOC Officials.

We reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

---

**CONCURRENCE/DISSENT**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. Over the course of more than two years, hundreds of women at the Huron Valley Correctional Facility endured an "unbearable" skin ailment. Live mites burrowed into their skin, causing red bumps and lesions on their wrists, armpits, fingers, waists, and genitals. Many women could not sleep, suffering "relentless" itching and "perpetual discomfort." Some contemplated suicide. While this infestation spread from one unit to the next—eventually plaguing eight of Huron Valley's fifteen units—the women "begged" for medical attention, lodging hundreds of grievances and alerting Defendants "countless" times. Despite these disturbing allegations, the majority grants Defendants qualified immunity on the pleadings. Because Plaintiffs plausibly allege clearly established Eighth Amendment violations, I respectfully dissent from Part II.A.

I.

"[T]he treatment a prisoner receives in prison and the conditions under which [s]he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation omitted). That Amendment imposes on state officials a "duty" to "provide humane conditions of confinement," including "adequate food, clothing, shelter, . . . medical care," and "safety." *Id.* at 832–33. (quotation omitted). A state official who is deliberately indifferent to these needs violates the Eighth Amendment. *Id.*

Plaintiffs ground their Eighth Amendment claims in two overlapping theories. *See, e.g.*, *Villegas v. Metro. Gov. of Nashville*, 709 F.3d 563, 569 (6th Cir. 2013) (outlining the kinds of "factual scenarios that frequently arise" in Eighth Amendment deliberate-indifference cases). First, Plaintiffs argue that MDOC and Wayne State officials (collectively, "Defendants") were deliberately indifferent to their medical needs. A "medical-needs" claim focuses on a deprivation or delay in prison medical care. *Id.* Second, they argue that Defendants were indifferent to their conditions of confinement. A "conditions-of-confinement" claim focuses on health and safety risks caused by prison conditions. *Id.* Although we have generally treated the

two types of claims as separate, they sometimes overlap. Indeed, there is "no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement," *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); "the medical care a prisoner receives" is nothing more than another "'condition of his confinement.'" *Id.* That overlap is especially pronounced here, where Plaintiffs' conditions-of-confinement claim is largely predicated on Defendants' failure to protect Plaintiffs from scabies, a medical condition. In any event, Plaintiffs' "complaint did not need to expressly plead legal theories; it [only] needed to plead factual allegations that impliedly established at least one viable theory." *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (citing *Johnson v. City of Shelby*, 574 U.S. 10 (2014) (per curiam)).

Both theories encompass an objective component. To establish a medical-needs claim, the plaintiff must show that her need was "serious," "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas*, 709 F.3d at 570 (citation modified). Under a conditions-of-confinement theory, the plaintiff must establish that she was "denied the minimal civilized measure of life's necessities . . . [which] include[] deprivations of adequate food, clothing, shelter, [medical care, and safety]." *Id.* (citation modified). Plaintiffs' complaint alleges that for years they endured "persistent," "unbearable[] pain," and were subjected to an infectious "breeding ground" that lacked proper sanitation or adequate cleaning procedures. R. 114, PID 1356–66. "Contemporary standards of decency" bar prison officials from exposing inmates to such prolonged and extreme conditions. *Villegas*, 709 F.3d at 568 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

Both theories of recovery also encompass a subjective element, requiring that the defendants were "deliberately indifferent" to the plaintiffs' needs. *Villegas*, 709 F.3d at 568. As the majority explains, Op. at 15, officials do not act with deliberate indifference under either theory if they "respond[] reasonably to" the inmates' needs after they learn of them. *Farmer*, 511 U.S. at 844. Plaintiffs adequately pleaded the subjective element, plausibly alleging deliberate indifference under either theory of recovery. Plaintiffs assert that Defendants knew that many inmates were suffering from a skin ailment and inferred the risks that outbreak posed.

A plaintiff may prove a prison official's knowledge and understanding through "inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. For example, a factfinder might infer that a prison official knew and understood a risk simply because the risk was "obvious," "pervasive," or "well-documented," and "the circumstances suggest that the . . . [defendant] had been exposed to information concerning the risk." *Id.* A plaintiff must prove the knowledge of "each individual defendant," but she may do so through "general allegations" about circumstances common to multiple defendants. *Phillips v. Roane County*, 534 F.3d 531, 542 (6th Cir. 2008).

Here, Plaintiffs allege that the skin condition was "pervasive" and "well-documented," and they provide "circumstances [to] suggest" that Defendants "had been exposed to information concerning" the outbreak. *Farmer*, 511 U.S. at 842. Nearly 200 prisoners—almost 10% of Huron Valley—were afflicted. *Cf. Bowers v. Livingston County*, 426 F. App'x 371, 373 (6th Cir. 2011) (holding that jail officials were unlikely to know about MRSA risks because the jail had a less-than-one-percent infection rate). Plaintiffs submitted "countless grievances" complaining of "unbearable itching pain." R. 114, PID 1355, 1426. Those grievances reached every level of the MDOC system—from Huron Valley's healthcare unit, to its wardens, all the way up to MDOC's Director. Plaintiffs thus allege that many Defendants received grievances about a painful rash spreading through the prison; other Defendants discussed the rash at monthly meetings of MDOC healthcare officials, and all Defendants were collectively responsible for coordinating a response. Indeed, Defendants appear not to dispute that they "were aware of the alleged scabies outbreak and unsanitary conditions." Reply Br. at 12. It is thus more than plausible that they "knew about facts from which they could infer that a substantial risk existed" and "drew that inference." *Finley v. Huss*, 102 F.4th 789, 805 (6th Cir. 2024).

Next, Plaintiffs have sufficiently alleged that Defendants disregarded the risk of harm that a spreading skin condition could inflict on other inmates. A prison official disregards a known risk "by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. This rule flows from a prison official's Eighth Amendment "duty . . . to ensure reasonable safety." *Id.* (quotation omitted). Whether a particular measure is "reasonable" depends on the severity of the risk, the resources at a defendant's disposal, and the defendant's "specific duties." *Darrah v.*

*Krisher*, 865 F.3d 361, 370–71 (6th Cir. 2017). A defendant may thus act with deliberate indifference if it is part of his "job" to respond to a certain risk, and he "d[oes] not do it." *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992); *Darrah*, 865 F.3d at 370–71. Similarly, where officials are aware that inmates face a substantial risk under the prison policies in effect, a failure to implement "measures to investigate and remove" the risk may be evidence of deliberate indifference. *Zakora v. Chrisman*, 44 F.4th 452, 474 (6th Cir. 2022).

In cases involving prison disease outbreaks, courts ask whether prison officials "responded reasonably" to the "risks posed by" the disease. *Wilson*, 961 F.3d at 840. For example, we held that prison officials responded reasonably to a COVID-19 outbreak where they implemented an "action plan to reduce the risk of . . . spread," which included "isolating and quarantining inmates who may have contracted the virus" and "cleaning common areas." *Wilson*, 961 F.3d at 840–41 (citation modified); *see also Wooler v. Hickman County*, 377 F. App'x. 502, 505 (6th Cir. 2010) (jail officials responded reasonably to a MRSA outbreak where they "cleaned every cell" and "quarantined the infected inmates"). In contrast, prison officials might respond unreasonably to a disease outbreak where they fail to implement "control and prevention" measures and do not separate symptomatic inmates from healthy ones. *DeGidio v. Pung*, 920 F.2d 525, 530–33 (8th Cir. 1990) (tuberculosis outbreak); *Seth v. McDonough*, 461 F. Supp. 3d 242, 261–62 (D. Md. 2020) (prison officials responded unreasonably to a COVID-19 outbreak where they tested very few inmates and did not isolate symptomatic prisoners).

The issue, then, is whether the prison officials responded unreasonably to Plaintiffs' ongoing, worsening skin afflictions, without regard to whether they specifically suffered from scabies. To illustrate, suppose Dr. Barkey's tests also returned a negative scabies result. That finding would not then permit Defendants to cease all efforts to identify and address the true underlying cause. If the conditions worsened for another two years, all while Defendants took inadequate steps to remedy the problem, we would not absolve them of responsibility merely because the tests said Plaintiffs were not suffering from scabies in particular.

Here, Plaintiffs allege that Defendants—as healthcare administrators, wardens, and corrections officials—were responsible for implementing policies to contain the spread of an evidently contagious skin condition at Huron Valley. Defendants controlled Huron Valley's

operations, living conditions, infrastructure, and sanitation policies. So any prison-wide safety protocols would require these Defendants' coordinated action. Yet, according to Plaintiffs, for the first two years of the outbreak, Defendants effectively did nothing to fight the outbreak, despite receiving "countless" grievances. *Id.* at 1402, 26. Defendants' ineffective suggestions and "rote responses," Op. at 4, do not show otherwise. And again, it is also immaterial that Corizon "ruled out" scabies in particular, Op. at 16, because prison officials still had a duty to address a worsening, evidently contagious condition.

The majority errs in overemphasizing Defendants' non-treating involvement. *See* Op. at 13–14. As the majority recognizes, an official must have only "'personally' participated 'in the unconstitutional action' in some way." Op. at 11 (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020) (citation omitted)). Such personal participation can be established where the official "implicitly authorized, approved or knowingly acquiesced in" another's misconduct in a way that showed their own deliberate indifference." *Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020)). None of that, of course, requires the official to have physically *treated* any inmate. Defendant Fisher, for example, "operat[ed] and overs[aw]" Huron Valley's health-care unit, R. 114, PID 1381, putting her in a position to "observe" inmates and "kn[o]w" that "many women were suffering." *Id.* at 1400–01. *See also Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("reinstat[ing]" claims against a prison's medical unit director who apparently "[n]ever spoke" to plaintiff, reasoning that discovery could show "physicians and nurses to whom [plaintiff] spoke reported" plaintiff's concerns to the director). Defendant Brewer, who met with Fisher "at least quarterly[]" regarding the facility's health care delivery and environment[,]" R. 114, PID 1381, along with Defendants Johnson and Osterhaut all participated in at least one meeting at which the inmates discussed the ongoing infestation. *Id.* at 1394, 1396, 1399. Defendant Hutchinson, MDOC's infectious disease coordinator, likewise "was fully apprised of the rash outbreak" and discussed it with Corizon's staff as early as 2017. *Id.* at 1413. The fact that these and the other Defendants did not directly perform exams in no way negates their personal involvement nor excuses their "implicit[] . . . approval" of Corizon's alleged mistreatment. *Tilley*, 15 F.4th at 761.

Echoing the Defendants, the majority also states categorically that "prison officials do not act with deliberate indifference" when they "rely on medical judgments made by medical professionals responsible for prisoner care." Op. at 12–13 (citing *Graham ex rel. Estate of Graham v. County of Washnetaw*, 358 F.3d 377 (6th Cir. 2004)). But that general rule must be understood in context. It is true that courts often find that prison officials are not deliberately indifferent in such cases, but those circumstances typically involve one inmate who experienced symptoms for only a relatively short period of time.[1] Under such circumstances, courts have held that a prison official acted reasonably—and by extension without deliberate indifference— in deferring to the medical team's judgments. Here, in contrast, the inmates endured a painful yearslong infestation that afflicted increasing numbers of them. I would not transpose such a limited rule onto these circumstances.

Moreover, two Defendants were themselves medical professionals. Defendant Dr. Carmen McIntyre "worke[d] closely" with Corizon's medical staff and was "responsible for monitoring the delivery of healthcare to all prisoners in the MDOC." R. 114, PID 1390. And Defendant Dr. James Blessman also collaborated with Corizon officials and supervised officials who were "personally involved" with the inmates' treatment. *See id.* at 1391, 1427. Indeed, Dr. Blessman "saw inmates at [Huron Valley] for the rash and was present when [an inmate] had 12

---

[1]*See, e.g., Estate of Graham*, 358 F.3d at 379–84 (one inmate symptomatic for two hours); *McGaw v. Sevier County*, 715 F. App'x 495, 496–98 (6th Cir. 2017) (one inmate symptomatic for less than four hours); *Howelll v. NaphCare, Inc.*, 67 F.4th 302, 309–16 (6th Cir. 2023) (*denying* qualified immunity to one guard where inmate was symptomatic for four hours); *Harrison v. Ash*, 539 F.3d 510, 514–20 (6th Cir. 2008) (one inmate symptomatic for less than eight hours); *Wingo v. WellStar Health Sys., Inc.*, 160 F.4th 1184, 1187–91 (11th Cir. 2025) (one inmate symptomatic for less than nine hours); *Spears v. Ruth*, 589 F.3d 249, 253–55 (6th Cir. 2009) (one inmate symptomatic for a few hours); *Mercer v. Athens County*, 72 F.4th 152, 157–63 (6th Cir. 2023) (one inmate symptomatic for one day); *Townsend v. Jefferson County*, 601 F.3d 1152, 1153–59 (11th Cir. 2010) (same); *Shaver v. Brimfield Tp.*, 628 F. App'x 378, 380–83 (6th Cir. 2015) (one inmate symptomatic for two days); *Smith v. County of Lenawee*, 505 F. App'x 526, 529–32 (6th Cir. 2012) (one inmate symptomatic for three days); *Winkler v. Madison County*, 893 F.3d 877, 885–96 (6th Cir. 2018) (one inmate symptomatic for five days); *Hehrer v. County of Clinton*, 161 F.4th 955, 959–964 (6th Cir. 2025) (one inmate symptomatic for four days); *Meloy v. Bachmeier*, 302 F.3d 845, 846–48 (8th Cir. 2002) (one inmate symptomatic for less than six weeks); *Spruill*, 372 F.3d 218, 224–36 (3d Cir. 2004) (finding it a "close[] question" where one inmate complained of back pain three times in less than two weeks); *Greene v. Crawford County*, 22 F.4th 593, 599–609 (6th Cir. 2022) (reversing qualified immunity to a defendant where one inmate was symptomatic for approximately one week); *Giles v. Godinez*, 914 F.3d 1040, 1045–50 (7th Cir. 2019) (one inmate alleging that for two years officials failed to properly treat his schizoaffective disorder); *Johnson v. Doughty*, 433 F.3d 1001, 1005–1010 (7th Cir. 2006) (one inmate symptomatic for seven months); *Burks*, 555 F.3d at 594–96 (reversing grant of summary judgment in favor of prison's head of medical unit, but affirming as to a grievance-processing colleague where one inmate submitted two grievances in approximately three months and spent "three stints"—split throughout nearly two years—in detention facility and allegedly went untreated).

skin scrapings and a biopsy in 2018." So even if "*non*-medical prison official[s]" may generally defer to a physician's judgment, Drs. McIntyre and Blessman cannot rely on that rule because they had the very "medical expert[ise]" that ordinarily justifies excusing the others. *See Spruill*, 372 F.2d at 237 (emphasis added).

In any event, reliance on medical judgment in itself does not supplant the central analysis: was it *reasonable* to defer to the medical team's conclusions? *See McGaw*, 715 F. App'x at 498 (citing *Doughty*, 433 F.3d at 1010 ("Cases in this and other circuits demonstrate that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he '*reasonably* deferred to the medical professionals' opinions.'") (emphasis added)); *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("A prison official may rely on a medical professional's opinion if such reliance is reasonable."). Indeed, courts do not excuse defendants where they have "reason to believe or actual knowledge that prison doctors or their assistants are mistreating or not treating a prisoner." *Spruill*, 372 F.3d at 236 (citation modified); *Colson v. City of Alcoa*, 2021 WL 3913040, at *6 (6th Cir. Sept. 1, 2021) ("[A] prison official may ordinarily rely on a medical professional's opinion, but only when the officer has no reason to believe that the medical professional's opinion was inappropriate or unreliable."). A contrary rule would perversely incentivize prison officials to outsource all medical concerns to a third party, forever immunizing their own indifference. At all times, officers are only "generally entitled" to rely on medical advice "for *a reasonable period of time* . . . [and] absent circumstances such as the *onset of new and alarming symptoms*." *Stojecvski v. Macomb County*, 827 F. App'x 515, 522 (6th Cir. 2020) (emphasis added) (quoting *Barberick v. Hilmer*, 727 F. App'x 160–64 (6th Cir. 2018) (per curiam)).

Plaintiffs' conditions stretched past two years, with new cases emerging each month. And if that alone did not demonstrate ineffective care, Defendants had further reason to doubt their medical team's treatment plan. "Corizon's track record working for MDOC ha[d] been abysmal, including a deeply troubling history of litigation and human rights abuses." R. 114, PID 1416 (quotations omitted). MDOC itself fined Corizon "$1.6 million in penalties . . . between 2016 and 2018 for failing to meet" contractual requirements, and placed the company on "course corrective plans, most of which relate[d] to timeliness of care." *Id.* Where such a

medical team also fails to remedy a yearslong health crisis, its supervising personnel cannot claim it was reasonable to unquestionably rely on the team's determinations.

In sum, Plaintiffs have plausibly alleged facts adequately establishing that Defendants were deliberately indifferent under both the medical-needs and conditions-of-confinement theories.

## II.

The majority denies relief on qualified immunity grounds, asserting that, "[n]o case would have given the MDOC and Wayne State Officials 'fair and clear warning'" that their alleged conduct violated the Eighth Amendment.  Op. at 10.  I find it premature to invoke this doctrine at such an early procedural stage.  And I would not demand that Plaintiffs identify a granularly analogous case, especially when doing so fails to advance the doctrine's purported objectives.

## A.

"[W]e have repeatedly cautioned" that it is "generally inappropriate" at the pleading stage to dismiss a complaint for failure to show the violation of a clearly established right.  *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023) (quotation omitted).  "Without more than the complaint to go on," a court generally "cannot fairly tell whether a right is . . . clearly established by precedent."  *Myers v. City of Centerville*, 41 F.4th 746, 757 (6th Cir. 2022) (citation modified).  The majority is correct that "qualified immunity is a threshold question to be resolved at the earliest possible point in the proceedings, [but] that point is usually summary judgment and not dismissal under Rule 12."  *Cooperrider v. Woods*, 127 F.4th 1019 (6th Cir. 2025) (citation modified) (citing *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)); *see also Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 234 (6th Cir. 2005) (Sutton, J., concurring) ("Individual defendants . . . will only rarely be able to establish that the right was not 'clearly established' at this stage of the dispute.").[2]  "[S]o long as

---

[2]Chief Judge Sutton's observation originates in a First Amendment case, but "our caselaw has applied [it] beyond" that analysis.  *Tilley*, 15 F.4th 752, 765 (citing *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020) (collecting cases)).

"[a] plaintiff states a plausible claim for relief," we will "generally den[y] qualified immunity." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020); *see also Tilley*, 15 F.4th at 763; *Siefert v. Hamilton County*, 951 F.3d 753, 761–62 (6th Cir. 2020) (similar).

The majority says this case nevertheless merits dismissal. But without a factual record on key questions, that decision is premature. *See Stojcevski*, 827 F. App'x at 522 (dismissing qualified immunity appeal where officials invoked the reliance-on-medical-advice rule but factual questions lingered). As the majority recognizes, clearly established law holds that "officers may act 'recklessly' if they defer to a prison doctor whom they know mistreats 'inmates.'" Op. at 12 (citing *Hehrer County*, 161 F.4th at 964); *accord Spruill*, 372 F.3d at 236 (Officials act with deliberate indifference when they have "reason to believe or actual knowledge that a prison doctor or their assistants are mistreating or not treating a prisoner." (citation modified)). Suppose discovery proved that Defendants like Hutchinson, McIntyre, Blessman, and Fisher, who all either "regularly" met with Corizon officials or directly supervised Corizon's care, R. 112, PID 1386, 1416, 1391, 1401, never questioned Corizon's treatment plan despite mounting evidence that it was ineffective, or that the infestation's documented growth rate clearly refuted Corizon's explanations. Knowing Corizon's "abysmal" track record—the MDOC itself imposing million-dollar fines—and its documented substandard care, Defendants' silence could amount to reckless conduct. As demonstrated above—and contrary to the majority's characterization, Op. at 12—Plaintiffs' complaint amply alleges that Defendants engaged in such "reckless" behavior. To the extent the majority seeks more evidence, it should, as the process is designed to do, allow this case to proceed through discovery. In any event, it is premature to dismiss Plaintiffs' case when the allegations plausibly demonstrate that Defendants' conduct violated clearly established law.

B.

The majority also errs in requiring that plaintiffs identify a granularly analogous prior case. For a right to be clearly established, a plaintiff need not provide a case in which "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). Instead, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*; *Dist. of*

*Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (similar). Although the "unlawfulness must be apparent in the light of pre-existing law," *Burwell v. City of Lansing*, 7 F.4th 456, 476–77 (6th Cir. 2021) (citation modified), that unlawfulness may be discerned from "direct holdings . . . specific examples described as prohibited, or from the general reasoning that a court employs." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 283 (6th Cir. 2020) (quotation omitted).

The majority excises principles from Fourth Amendment excessive-force cases, *see* Op. at 8–9. However, the qualified immunity claimed here arises in the Eighth Amendment deliberate-indifference context. Here, unlike in excessive-force situations, courts may define the right using "somewhat less granular principles[.]" *Finley*, 102 F.4th at 809. That makes sense because qualified immunity exists to "protect[] officials who must make *split-second decisions* while protecting the public." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (emphasis added). Indeed, when an officer must act "in haste, under pressure, and . . . without the luxury of a second chance," *Farmer*, 511 U.S. at 835 (citation modified), it is "difficult for the officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted). But the same concerns do not apply to officials "who have time to make calculated choices about . . . enforcing unconstitutional policies." *Hoggard v. Rhodes*, ⸺ U.S. ⸺, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.). "[W]hy should [they] . . . receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?" *Id.*

*Finley* shows that the applicable level of generality is related to the amount of time an official has to respond to a situation. Thus, even in ordinary deliberate indifference cases (i.e., those spanning days or weeks, *see supra* n.1) courts still allowed "broader articulations of clearly established principles" than in the Fourth Amendment context, where officials have only seconds to act. *Finley*, 102 F.4th at 808. Here, Defendants had *years* to consider whether their response violated Plaintiffs' constitutional rights. I see no reason to demand a granular analogue where officials had limitless time to consider whether their conduct was lawful.

In any event, clearly established caselaw gave the officials sufficient notice. The Supreme Court has long held that prison officials violate the Eighth Amendment when they are "deliberately indifferent to the exposure of inmates to a serious, communicable disease."

*Helling*, 509 U.S. at 32; *Hutto v. Finney*, 437 U.S. 678, 683 (1978), *abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024). And we have reiterated that inmates have an Eighth Amendment right "not to have [one's] known, serious medical needs disregarded" by prison officials. *See, e.g.*, *Howell*, 67 F.4th at 310; *Mercer*, 72 F.4th at 162–63; *Burwell*, 7 F.4th at 477. Defendants should therefore have known that in allowing an infestation to last years, afflicting an ever-growing number of inmates, they likely would violate Plaintiffs' rights.

The majority, however, adds another layer. Plaintiffs must lose at the pleading stage, the majority seemingly asserts, unless they can cite a precedential case involving inmates who endured sufficiently inexcusable mistreatment *and* where the prison officials unreasonably relied on prison doctors. But even in ordinary qualified immunity cases (i.e., ones where defendants had seconds not years to respond), plaintiffs need not provide a case in which "the very action in question has previously been held unlawful." *Hope*, 536 U.S. at 739. The majority also compounds the misconception that prison officials may immunize unconstitutional behavior simply by outsourcing their own responsibilities. Where plaintiffs sufficiently allege that they suffered yearslong cognizable mistreatment, their claims should not be extinguished merely because the case happens to involve a medical team's erroneous or negligent determinations.

\*\*\*

Because Plaintiffs plausibly allege Eighth Amendment violations to which the qualified immunity doctrine does not clearly apply, I respectfully dissent from Part II.A.